IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 21, 2023 Session

## STATE OF TENNESSEE v. CHRISTOPHER LEE GOODWIN

**Appeal from the Circuit Court for Maury County**
**No. 27657     Stella L. Hargrove, Judge**

_____

### No. M2022-00540-CCA-R3-CD

_____

The Defendant-Appellant, Christopher Lee Goodwin, was convicted by a Maury County Circuit Court jury of felony murder committed in the perpetration of aggravated child neglect, and the trial court imposed a sentence of life imprisonment.  On appeal, the Defendant argues: (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred in denying his motion to suppress statements made to police; (3) the aggravated child neglect statute violates due process with its vagueness; (4) the trial court violated his right to a fair trial when it overruled the defense objection and allowed the State to present evidence that the medical examiner in this case lost his medical license; (5) the trial court erred in sustaining the State's hearsay objection to his questioning of an investigator about a statement that a witness allegedly made to him; (6) the trial court erred in not declaring a mistrial when an investigator testified about a domestic violence incident between the Defendant and the victim's mother; and (7) that a single prosecution for felony murder predicated on both aggravated child abuse and aggravated child neglect violates double jeopardy.[1]  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which KYLE A. HIXSON and MATTHEW J. WILSON, JJ., joined.

Patrick T. McNally, Nashville, Tennessee (on appeal) and Lee Ofman, Franklin, Tennessee (at trial) for the Appellant, Christopher Lee Goodwin.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Jude Santana, Kyle Dodd, and Jonathan Davis, Assistant District Attorneys General, for the Appellee, State of Tennessee.

---

[1] We have reordered these issues for clarity.

# OPINION

On January 20, 2001, the fifteen-month-old victim, J.S., while in the sole care of the Defendant, suffered an occipital skull fracture, a subdural hematoma, and continued subdural bleeding. Despite these serious injuries, the Defendant waited several hours before taking the victim to the hospital. Although hospital staff attempted to save the victim's life, the victim died from his injuries.

In 2019, a Maury County Grand Jury indicted the Defendant for one count of felony murder committed in the perpetration of aggravated child abuse and one count of felony murder committed in the perpetration of aggravated child neglect.

Prior to trial, the Defendant filed a Motion in Limine, objecting to the introduction of evidence that the medical examiner, Dr. Charles Harlan, was incompetent when he performed the victim's first autopsy and that Dr. Harlan subsequently lost his medical license in 2005. As a part of this motion, the Defendant asked the trial court to prevent the State from introducing proof of the Defendant's prior domestic assault conviction. Although the trial court ruled that proof of the Defendant's prior domestic violence conviction was inadmissible, it found that evidence of Dr. Harlan's incompetency and revoked medical license was relevant and admissible.

**Motion to Suppress.** Thereafter, the Defendant filed a motion to suppress the statements he made to law enforcement. Following a hearing, the trial court denied this motion.

At the suppression hearing, Investigator Charity Roe with the Huntsville Police Department in Alabama testified that she initially spoke to an investigator at 10:30 p.m. on January 20, 2001, who told her that the victim, who had sustained multiple head injuries and was in extremely critical condition, had been flown to the Huntsville Hospital; that the victim's injuries involved "possible child abuse[;]" that the victim's mother and her boyfriend, the Defendant, were on their way to that hospital; and that the victim was not expected to survive. She said that officers who were at Maury Regional Hospital were told that the victim "fell off the bed" and this was relayed to her through dispatch.

Investigator Roe advised Officer Jason Hall with the Huntsville Police Department to immediately separate the victim's mother and the Defendant because she "didn't want them to realize that the child was dead and for them to have time to make up a story" for how the victim was injured. She added that it was "normal protocol" to look at the family members first when a child is injured.

Investigator Roe said she first spoke to the Defendant at the Huntsville Hospital at approximately 11:15 p.m. She said the Defendant was with a police officer in a waiting room of the hospital; however, she did not believe that this officer stayed in the room while she interviewed the Defendant. She acknowledged that both she and the other officer were armed. She also said a chaplain was in the room when she interviewed the Defendant.

During the interview, Investigator Roe informed the Defendant that she was an investigator who was investigating a possible criminal case, although she did not believe she used those exact words. She had been told by one of the officers that the Defendant was alone with the victim after the victim's mother left for work, so she deemed the Defendant a "possible suspect."

Investigator Roe stated that anytime she questioned a suspect, the "first thing" she would do would be to read the suspect his or her Miranda rights. In this case, Investigator Roe asserted that she read the Defendant his Miranda rights but did not obtain a signed rights waiver form from him. She acknowledged that at the time of the interview, the Defendant was detained and not free to leave, and the Defendant was not allowed to communicate with the people with whom he came to the hospital. Investigator Roe asserted that the Defendant received the Miranda warnings and then agreed to talk to her.

During the interview, the Defendant told Investigator Roe that the victim "fell out of the bed," although he did not see the victim fall out of the bed, and that the victim "seemed fine." Investigator Roe said the Defendant never told her that he knew the victim was injured from the fall off the bed.

Investigator Roe stated the Defendant initially said that the victim's mother left for work around 2:20 or 2:30 p.m., and between 2:45 and 3:00 p.m., the victim woke up and began crying in his playpen. He said he laid the victim "on his chest" until the victim went back to sleep and about an hour later, he woke the victim up, who "was full of sweat[,]" so he got a washcloth for the child. He said that while he was getting the washcloth, he heard "[a] thump" and "assumed" the victim "had fallen out of the bed." The Defendant claimed that "by the time he got back" with the washcloth, the victim had gotten "back in the bed" by himself. He claimed he gave the victim some apple juice at 5:15 p.m. and then tried to wake the victim at 6:00 p.m. to give him medicine, but he could not wake up the victim. The Defendant said that the victim was "rubbing his eyes like he was tired" and was "moving his arms and his legs" but "would not open his eyes." The Defendant told her that "he just couldn't seem to wake the child up" and was checking on the victim "every ten minutes."

Investigator Roe said that after she talked to the Defendant, Dr. Pickett came to talk to her during the middle of surgery on the victim and said that the victim "had multiple

skull fractures[.]" Dr. Pickett continued that although the victim's mother had said that the victim fell off the bed, "the child could not receive that amount of injury from a small fall off the bed" and that "he did not expect the child to live." Dr. Pickett also told her that he generally sees the type of injury that the victim sustained when somebody has been "hit with a baseball bat." Investigator Roe said Dr. Pickett told her that "this child was murdered, plain and simple" and that he would "go to [c]ourt" to do what he needed to do. When asked if Dr. Pickett told her who abused the victim, Investigator Roe replied:

> No. But the time line that was set from the story Dr. Pickett had got[ten] from falling off the bed and the time line, this child would have been unconscious and incapacitated. He put the time around [3:00 p.m.] [The victim's] mom had left for work at 2:30. The child was up and around. [The Defendant] said he put him in the bed and he was the one that was watching the child and home with the child at that time.

Investigator Roe said that the Defendant later told her that after the victim's mother left, the victim was up between 3:30 and 4:00 p.m. for "20 to 45 minutes" and then went to sleep after that. She quizzed the Defendant about this large disparity in time because Dr. Pickett put the victim as injured, incapacitated, and unconscious at 3:00 p.m., which would mean that the victim would not be up and would not be drinking from a sippy cup.

Investigator Roe said that because the Defendant gave her different stories with different times, she believed that the Defendant could not keep his time line straight. She said that after talking to Dr. Pickett, she knew that a fall off the bed could not have caused the type of head injury that the victim sustained. While she was unable to say what caused the victim's injury, Investigator Roe asserted that the victim was with the Defendant when he was injured.

Investigator Roe did not know how long she interviewed the Defendant in the waiting room of the Huntsville Hospital. However, at the end of the interview, she had the Defendant transported in handcuffs to the Huntsville Police Department. She said that she told Lieutenant Brady and Detective Fogle of the victim's injuries, the Defendant's version of what happened, and Dr. Pickett's description of the victim's injuries. She recalled that Lieutenant Brady and Detective Fogle talked to the Defendant at the police department for only eight to ten minutes, and she did not recall whether she was in the room when Lieutenant Brady and Detective Fogle spoke to Defendant at the station. She was surprised that Lieutenant Brady and Detective Fogle spent such a short time speaking with the Defendant, whom Investigator Roe believed was the prime suspect in the case, and then let the Defendant and the rest of the family to go home together and never did anything to

secure the crime scene. She stated that the only way she got Lieutenant Brady and Detective Fogle to come to Huntsville was by telling them that "there was a dead baby" and that "somebody from [their] jurisdiction needed to respond and take possession of that body."

Investigator Roe said that she did not feel that Brandy Eddlemon, the victim's mother, was a suspect in the victim's death. She asserted that the Defendant told the units that transported the victim to Huntsville that the victim fell off the bed around 3:00 p.m. and that when he checked on the victim at 6:00 p.m., he could not wake the victim. She noted that this statement conflicted with the Defendant's statement to her that he was checking on the victim "every ten minutes." Investigator Roe stated that she felt like the Defendant was lying to her about what happened to the victim because he "kept changing his times" about when the victim "fell off the bed," when the victim "woke up," when he took the victim "out of the playpen," when he laid down on the bed with the victim, and when he had the victim "on his chest patting him, giv[ing] him a sippy cup."

Investigator Roe acknowledged that when she was questioning the Defendant, she did not know how long he had been awake. She agreed that the Defendant had "just come from Columbia to the hospital where his girlfriend's child was in dire straits." Investigator Roe said that she asked the Defendant about the time line of when the Defendant was present, what the victim was doing at the time, and what the Defendant did from when he got home until the Defendant and his father took the victim to Maury Regional Hospital. When asked what the difference in all of that time would make if the fall off the bed was not the cause of the victim's injuries, Investigator Roe said,

> Because it locks [the Defendant] into a time line of what he has done, what the child was doing, . . . which they can put together with the doctor's knowledge of when that child was injured and . . . lock[s the Defendant] into a statement in case he chooses to change it once he gets back to their jurisdiction.

Investigator Roe noted that the Defendant claimed the victim "[f]ell off the bed, [was] crawling back in bed by himself at 15 months old with a cast from his hip to his ankle from a previous broken leg, but he crawled back in bed by himself[.]"

On cross-examination, Investigator Roe stated that she had been in law enforcement for twenty-seven years and had first become an investigator in 1999. She said that when she was promoted to investigator, she shadowed other experienced investigators. She stated that whenever you had a suspect that may have committed a crime, it was appropriate to read the suspect his or her Miranda rights because "it protects them" and "it protects [the officers]." She said that when it is not clear that a crime has been committed and the

individual is not in custody, then an investigator does not read the individual his or her Miranda rights. She asserted that she had received adequate training about when it is was necessary to provide Miranda warnings to an individual.

Investigator Roe asserted that the Defendant was detained and not free to leave while he was at the Huntsville Hospital and at the Huntsville Police Department; therefore, it was appropriate for the Defendant to be read his Miranda rights, which she did. She said that she read the Defendant's Miranda warning from a card that listed the full Miranda warning on it and that she "always" used the card to ensure that the Miranda warning was given "word for word." She said that after providing the Miranda warning to the Defendant, the Defendant agreed to talk with her. She stated that she talked to the Defendant at around 11:30 or 11:45 p.m. on January 20, 2001, for approximately fifteen minutes at the Huntsville Hospital, and then the Defendant was transported at her request to the Huntsville Police Department. She said that Lieutenant Brady and Detective Fogle arrived at the Huntsville Police Department around 6:00 a.m. on January 21, 2001, and that she briefly spoke to them before they spoke to the Defendant. She did not recall whether she was present during Lieutenant Brady's and Detective Fogle's interview with the Defendant, but she said that she would have allowed them to take the lead in that interview because the crime took place in their jurisdiction. She said that the Defendant and Brandy Eddlemon were kept separated at both the Huntsville Hospital and the Huntsville Police Department.

Investigator Roe stated that during the time she spoke to the Defendant, the Defendant never confessed to a crime and never confessed to intentionally or accidentally hurting the victim. She said the Defendant "just remained shaky and started to put his head down" and would not look at her. She also said the Defendant "[s]tarted to cry at different times."

Investigator Roe said that she expected Lieutenant Brady and Detective Fogle to follow up with her because they told her that she would hear from them. However, she never heard from them. "[Y]ears later," Investigator Roe was contacted by a female agent at the Tennessee Bureau of Investigation (TBI), who told her that the TBI was trying to bring criminal charges against the Defendant for the death of the victim. Investigator Roe explained that the victim had been pronounced dead before she ever left the Huntsville Hospital.

Investigator Roe said that although the Defendant gave a written statement that night, the Defendant never confessed to a crime. When asked if the Defendant's written statement departed from what he had told her verbally, Investigator Roe stated that the Defendant originally told her that he "thought [the victim] had fallen off the bed because he heard the thump" and that the victim must have "crawled in" the bed "by himself";

however, the Defendant asserted in his written statement that his nephew Cody "had walked in and told him that [the victim] had fallen off the bed" and then the Defendant "went into the bedroom" and saw the victim "on the floor." She noted that Cody was six years old and the victim was fifteen months old at the time.

On redirect examination, Investigator Roe acknowledged that she did not have the Defendant sign a Miranda waiver and did not make a note about reading the Miranda warnings to the Defendant. However, she insisted that as a part of her "protocol," she "always" read Miranda to potential suspects. She asserted that she read the Miranda warnings to the Defendant at the Huntsville Hospital and the Huntsville Police Department.

Investigator Roe said that in addition to the Defendant, she also talked to Brandy Eddlemon, Vernon Goodwin, and Dr. Pickett at the hospital. She acknowledged that the Defendant was being held in an isolated room at both the hospital and the police department and that he was not free to leave. She also agreed that there was no question that the Defendant was in custody at the time that she read him his Miranda rights.

Detective Jason Fogle of the Maury County Sheriff's Department testified that he first became aware of this case around 6:00 p.m. on January 20, 2001. He said that Investigator Roe informed him and Lieutenant Jim Brady of what the victim's mother and the Defendant had said about the incident involving the victim. He was not aware that the Defendant was being held alone at the Huntsville Police Department until he got there, which was around 5:00 a.m. He said that it took them so long to get to Huntsville because they did not find out that the victim was injured in Maury County, rather than at the victim's mother's residence in Lewis County, until 1:00 a.m.

Around 2:00 a.m., Investigator Roe called and informed him and Lieutenant Brady that she had the family detained at the police station and that the Defendant had said that the victim had fallen off the bed and landed on the floor around 3:00 p.m. on January 20, 2001. Investigator Roe also said that she had spoken to Dr. Pickett, the neurosurgeon in this case, who said he did not believe that the victim's injury could have been caused by falling off the bed onto carpet.

Detective Fogle asserted that he and Lieutenant Brady first spoke to the Defendant at the police station, where the Defendant was sitting in an interview room handcuffed and not free to leave. He said that Investigator Roe was not with them when they conducted the interview with the Defendant. Detective Fogle said they read the Defendant his Miranda rights before asking him any questions because the Defendant was in custody. They then asked the Defendant to start his written statement of events from the time that Brandy Eddlemon left for work because the Defendant indicated that the victim's injury occurred after Brandy left for work. He said the Defendant told them that he was watching

the victim after Brandy Eddlemon left for work and that the victim had a cold. The Defendant said that at some point, he had gotten up to get a washcloth or to get something for the victim and when he returned he found the victim sitting up in the floor crying.

Detective Fogle said the Defendant said that he thought the victim had fallen from the bed, but he did not recall the Defendant saying anything about whether the victim had hurt his head or was injured from this fall. Detective Fogle acknowledged that he had no evidence showing that a weapon was used to cause the victim's injury or that the victim's injury occurred in that bedroom. However, he asserted that if a child falls off the bed and is lying on the floor screaming, "anybody would assume that they were hurt."

Detective Fogle said that they took the handcuffs off the Defendant right after they read him his Miranda rights but before the Defendant wrote out his statement. He noted that the Defendant's verbal and written statements were "fairly consistent." Detective Fogle said that he and Lieutenant Brady were with the Defendant at the police station for less than an hour. At the conclusion of the interview, the Defendant was free to go. At that point, Detective Fogle and Lieutenant Brady went to the Defendant's home on Gene Fitzgerald Road and took a statement from six-year-old Cody, although Detective Fogle said Cody was not extremely communicative.

On cross-examination, Detective Fogle acknowledged that Lieutenant Brady was his "boss" in 2001, although Lieutenant Brady passed away three or four years prior to this trial. He said that the security guard at Maury Regional Hospital notified him that the victim had died while at the Huntsville Hospital. He asserted that Investigator Roe did not tell him and Lieutenant Brady what to ask the Defendant during their interview.

Detective Fogle agreed that Lieutenant Brady told the Defendant to forget about anything he had said to anyone else and to tell them the truth. He said that during the interview, he and Lieutenant Brady were not going back and referencing what the Defendant had or had not told Investigator Roe. He said that they did not have Investigator Roe's notes to use as reference when questioning the Defendant and were not comparing what the Defendant said to them against what he had said to Investigator Roe.

Detective Fogle asserted that the Defendant acted like he understood his Miranda rights and did not seem drunk or high at the time of questioning. He stated that at the end of the interview they released the Defendant and did not bring any Maury County charges against him that day.

When they went to the home on Gene Fitzgerald Road, Detective Fogle and Lieutenant Brady took some photographs but did not speak to the Defendant again and did

not remember the Defendant being present. He said that January 21, 2001, at the Huntsville Police Department was the last time he ever spoke to the Defendant.

Detective Fogle said that the Defendant never confessed to a crime during his interview with him in Huntsville. He confirmed that the Defendant's two-page written statement was taken by him and Lieutenant Brady.

On redirect examination, Detective Fogle acknowledged that "almost all" of the information he and Lieutenant Brady knew about the incident involving the victim came from Investigator Roe. He agreed that the case concerning the victim was closed, meaning that they were not going to investigate any further, the day after his interview with the Defendant. Detective Fogle said that there was no question in his mind that the Defendant was in custody and not free to leave at the time of their interview, which was why they read the Miranda warning to the Defendant prior to questioning him.

Investigator Tommy Goetz with the 22nd Judicial District Attorney's Office testified that he talked to the Defendant three different times as a part of his investigation. Investigator Goetz did not read the Defendant his Miranda rights before the first two interviews on February 24, 2015, and March 12, 2015, because the Defendant was not in custody and he did not feel he had enough information to charge the Defendant with a crime. He said that while he knew slightly more information at the time of the second interview, he did not have enough proof to make the Defendant a suspect. On March 26, 2015, the Defendant called him and advised that while he had decided not to take a polygraph test, he would help the district attorney's office in any other way he could.

Investigator Goetz said he read the Defendant his Miranda rights before the third interview at the district attorney's office on June 18, 2019, because he treated the Defendant like a suspect, even though he was not in custody, and believed beyond a reasonable doubt that he was guilty of murder. He acknowledged, however, if the Defendant had tried to leave, he would have let him go. He stated that TBI Agent Leslie Purvis was present during this interview, but he was unsure whether she was wearing a weapon. He acknowledged that he was wearing a weapon during the Defendant's June 18, 2019 interview.

Detective Goetz said that during the June 18, 2019 interview with the Defendant, he went over a lot of his evidence and made it clear to the Defendant that he believed the Defendant committed the crimes against the victim. He said that during the interview, the Defendant never requested an attorney, so they talked. Detective Goetz believed he had enough evidence to prove that the Defendant committed the crime after talking with Dr. Pickett, Dr. Lowen, and Dr. Lewis, after listening to the 9-1-1 call, and after reviewing the 2001 interviews of the Defendant, Vernon Goodwin, and Brandy Eddlemon. He concluded that the victim's injury occurred around 3:00 p.m. on January 20, 2001, because the

Defendant asserted in his 2001 statement that he went to the bathroom and the victim fell off the bed around 3:00 p.m. and that he picked up the victim and consoled him and had no reason to believe the victim was hurt. Investigator Goetz said he reached the conclusion that the victim's injury occurred at 3:00 p.m. because that was "the only time that the child could have been injured," according to the Defendant. He said he never discovered any information indicating that the victim's injury did not occur at 3:00 p.m.

Detective Goetz acknowledged that Amy Harless had given a statement to the TBI in 2001, stating that Brandy had told her that the victim was hurt before Brandy went to work. However, when Detective Goetz interviewed Harless about that statement, Harless said she did not recall saying that. Detective Goetz said that he interviewed Linda Goodwin, Vernon Goodwin, Cody, and the Defendant, and no one indicated that there was an injury or incident involving the victim, but Vernon said he heard "a thump" around 3:00 p.m. on January 20, 2001. He also said that based on what the medical experts said, the victim could not have been hurt before Brandy went to work because the child would not have been conscious or eating and drinking and because everyone would have known something was wrong with the victim.

Detective Goetz acknowledged that Brandy said that when the Defendant returned home from Lowe's on January 20, 2001, the victim was asleep. He agreed that the victim was never described as playing or being normal when the Defendant returned home. Detective Goetz said that although the Defendant claimed that the victim was sitting up two feet from the armoire, Detective Goetz did not believe that the victim hit the armoire because he was sitting up, crying, and the Defendant claimed he picked him up, consoled him, and began watching television. Detective Goetz claimed that Dr. Lowen, Dr. Pickett, Dr. Podgarski, and Dr. Lewis said that the victim would not have been able to sit up or cry given the victim's injuries. He added that all the medical experts said the victim either would have been unconscious or if not, everyone in the room would have known there was something wrong with the victim. Detective Goetz said that he believed the victim was slammed to the floor or into the bed post or was hit with a fist to the back of the head; he asserted that "[i]t took something with a whole lot of force" to cause the victim's injuries. He acknowledged that the victim did not have an open wound to the head but asserted that he knew the victim's injuries "didn't happen by falling off a bed that's 22 inches to a carpet floor." Detective Goetz acknowledged that no medical experts told him that the victim's injury had to have happened at 3:00 p.m. when the Defendant was alone with him. He also acknowledged that the Defendant never mentioned that the victim had a head injury on the 9-1-1 call but that the Defendant did state a couple of times that the victim acted like he had been "knocked out."

Detective Goetz said that during the June 18, 2019 interview he accused the Defendant of committing a crime against the victim. He had determined that the Defendant was guilty several weeks before the June 18 interview.

On cross-examination, Detective Goetz said he administered the Miranda warnings to the Defendant at the June 18, 2019 interview because he knew he was going to accuse him of committing crimes against the victim. He said the Defendant waived his Miranda rights and did not ask for an attorney at any point during the interview. When he asked the Defendant about the victim drinking from a sippy cup after his fall, the Defendant said that he had given the victim the sippy cup but the victim may not have taken a drink from it, which was different from what the Defendant had previously told him. Detective Goetz confirmed that the Defendant never confessed to committing a crime in any of the three interviews. He agreed that a bedpost could be a weapon with a young victim.

Detective Goetz said that he was present during the victim's second autopsy and the victim had a massive fracture starting at his spine and going up and over and all the way around the victim's skull. He agreed that the victim sustained a "massive blow to the head." Detective Goetz said that Dr. Pickett opined that in order for the victim to sustain an injury like this, he would had to have been "pitched out of a second story window" or "off of an upper deck" or "down a flight of stairs." In addition, Dr. Lowen told Investigator Goetz that the victim would had to have been thrown out a second story window, and Dr. Levy told him that the victim would had to have been hit with a baseball bat to sustain this type of injury.

On redirect examination, Detective Goetz said that because the victim did not have an open head wound, there was no blood on anything in the room that could have been used as a weapon. He acknowledged that a forensic team never investigated the bedroom to try to collect evidence.

Detective Goetz said that Dr. Lauridson told him to be careful using the digestive theory as a way to determine the timing of the victim's injury because you cannot always tell how much the child ate or how much the child threw up.

Detective Goetz said that the recording of the January 21, 2001 interview between Lieutenant Brady, Detective Fogle, and the Defendant showed that Lieutenant Brady told the Defendant to write down everything, and the Defendant chose to start his written statement at 2:30 p.m. on January 20, 2001.

Detective Goetz stated that he never implied that nothing was going to happen to the Defendant at the time he provided his Miranda rights to him. He said that he did not have the Defendant sign a waiver at the June 18, 2019 interview because of the fact that he

advised him of his <u>Miranda</u> rights was audio and video recorded.  He said there was "no doubt" the Defendant was advised in full of his <u>Miranda</u> rights that day.

At the conclusion of the suppression hearing, the trial court found that Investigator Roe's testimony that she provided <u>Miranda</u> warnings twice to the Defendant prior to questioning, both at the hospital and at the police station, was credible.  Consequently, the trial court concluded, and defense counsel agreed, that <u>Seibert v. Missouri</u> was not applicable to the Defendant's case.[2]  The trial court also agreed with the State that while Investigator Roe did detain the Defendant in Huntsville, this was not an illegal detention because she informed the Defendant of his <u>Miranda</u> rights prior to any questioning.[3]  Ultimately, the trial court held that it was "going to overrule [the] Motion to Suppress."

**Trial.**  The State offered the following proof at trial.  Brandy Eddlemon, the victim's mother, testified that she was a registered nurse and had a master's degree in business.  She stated that she met the Defendant when the victim was eleven months old, and she and the Defendant began dating in September 2000.  The Defendant, who did not have children of his own, lived with his parents, Vernon and Linda Goodwin.  She said Vernon and Linda Goodwin had custody of Defendant's nephew Cody, who also lived with them.

Eddlemon stated that in December 2000, the victim broke his leg at her apartment while Eddlemon and her mother were present.  She said the victim broke his leg by falling into an oven drawer and that the victim had a cast on his leg at the time of this incident.  She also said that in the days preceding January 20, 2001, the victim had caught a cold and was taking antibiotics.

On the morning of January 20, 2001, the Defendant's mother, Linda Goodwin, was already at work when Eddlemon awoke.  She went into the living room and observed the Defendant and the victim sitting in a recliner in the living room.  She said the Defendant later left to go to Lowe's at 12:30 p.m.

At 1:00 p.m., Eddlemon fed the victim spaghetti with mushrooms and tomatoes, and the victim finished all of his food.  At the time, Eddlemon, the victim, Vernon Goodwin, and Cody were present in the home.  She stated that the victim was "fine" and was acting normally.  Around 1:30 p.m., Eddlemon laid down with the victim in a king size bed to take a nap, but she got up a short time later because she had to go to work.  She put the victim in his playpen in the bedroom, and the victim was asleep when the Defendant returned and when she left for work around 2:20 p.m.

---

[2] <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004).
[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

- 12 -

While she was at work, Eddlemon spoke to the Defendant around 5:00 p.m. to remind the Defendant to give the victim his antibiotic medicine. She called again at 6:00 p.m. to make sure the Defendant gave the victim his antibiotic, and the Defendant told her that the victim "was acting a little bit unusual" and that he "couldn't get him awake[.]" Eddlemon told the Defendant to bring the victim to Maury Regional Hospital where she was working. At the time, the Defendant did not tell Eddlemon anything about the victim falling off the bed or the victim having fallen.

A short time later, Eddlemon's supervisor told her that the Defendant and the victim were in the emergency room. When she got there, Eddlemon saw the victim, who was unconscious, lying "on a stretcher being ventilated" with the help of "a respiratory therapist."

Eddlemon stated that during a conversation they had after the victim died, the Defendant told her he had taken the victim out of the playpen and laid down with the victim on the bed. The victim fell asleep on the Defendant's chest and drooled on him, so the Defendant placed the victim on the bed while he went to get a wet rag. The Defendant said that while he was in the bathroom, he heard the victim fall from the bed around 3:00 p.m. He came back to the bedroom and observed the victim crying on the floor. Eddlemon said the victim was later "life flighted" to a hospital in Huntsville, Alabama, where the victim passed away.

Eddlemon eventually reviewed the victim's autopsy report that was prepared by Dr. Charles Harlan and spoke to Dr. Harlan regarding the victim's autopsy. She noted that after the victim's death, Dr. Harlan was accused of malpractice, and she had questions about Dr. Harlan's conclusion that the cause of the victim's death was "an accident." She stated that in 2001, no one from the medical examiner's office, the sheriff's department, or the district attorney's office told her anything other than that the victim's death was an accident. Two months after the victim's death, Eddlemon married the Defendant while pregnant with their son, Braden. They divorced in 2006, and during their marriage the Defendant never told her anything different about the circumstances of the victim's death.

Eddlemon said that the investigation into the victim's death resumed in 2014, with the election of a new district attorney. The victim's body was later exhumed in order to do a second autopsy.

Eddlemon stated that two or three years prior to trial, Investigator Goetz asked her to call the Defendant on a recorded line. She asked the Defendant about the victim, and the Defendant repeated what he had previously said about the victim being on his chest, that he had a little bit of vomit, and that the Defendant got up to go to the bathroom and heard a thud.

Eddlemon said that she first met the Defendant through Amy Harless, who was the Defendant's friend. While Eddlemon denied being close friends with Harless, she acknowledged that they were friends who had mutual acquaintances. Eddlemon did not recall calling Harless the day of or the day after the victim's death, and she asserted that Harless probably would not have been someone she would have called for consolation or support because they had only recently become friends at the time of the victim's death. Eddlemon denied telling Harless or anyone else that the victim had already suffered a head injury before she left for work on January 20, 2001. She claimed that such a statement would be false because the victim was not injured before she left for work. Eddlemon denied doing anything to the victim to cause his injuries.

On cross-examination, Eddlemon said that she had known the Defendant for four or five months at the time of the victim's death. She acknowledged that the Defendant "was kind" to the victim and would change his diaper and feed him. She also said that she was not aware of the Defendant hitting the victim. She said that the victim called the Defendant "Daddy" and that they had discussed the Defendant adopting the victim.

Eddlemon acknowledged that Cody, often played with the victim. She noted that Cody had a "severe speech impediment" that made communication with him difficult.

She said the Defendant told her that when he went to the bathroom to get a wet rag, he heard "a thump" and when he returned to the bedroom, he saw that the victim had fallen off the bed and was on the floor crying. The Defendant told her that he picked up the victim, checked on him, and put him back on the bed. She did not recall the Defendant telling her that he saw anything wrong with the victim. She found out later that the victim had vomited up some of the spaghetti he had eaten earlier. Eddlemon acknowledged that she was not presented with new evidence at the time that she agreed to a second autopsy of the victim.

Vernon Goodwin, the Defendant's father, testified that at 12:45 p.m. on January 20, 2001, he and Cody got home and saw Brandy and the victim, whose face was "red and kind of puffy" and whose eyes were swollen like he had "been crying for some time." Vernon said that although the victim was usually "happy, loving," the victim was not himself that day.

Later, after Brandy had gone to work and while the Defendant was alone with the victim in the bedroom, Vernon "heard a thump" and he and Cody went to check on the victim around 2:20 p.m. on January 20, 2001. When they entered the bedroom, the victim was sitting on the floor, and the Defendant "was in the bathroom getting a wash rag."

Vernon said he "assumed" the victim fell off the bed in light of the "thump" he heard and the victim's presence on the floor.

Vernon said that "nothing" seemed to be "wrong" with the victim. He noted that the victim was not crying and he "looked okay." Vernon and the Defendant did not say anything to one another, and Vernon returned to the living room to watch television.

Later, Vernon was informed by the Defendant that the victim "would wake up but not all the way." Vernon said that his mother held the victim while the Defendant called 9-1-1 and that he, his mother, and the Defendant together decided to take the victim to the hospital. The next morning, Vernon said he was interviewed by Detective Jim Brady from the Maury County Sheriff's Department in Huntsville.

Vernon recalled being interviewed by Investigator Tommy Goetz on February 23, 2015. During this interview, Vernon agreed that he stated that when he got home, the victim was crying, and he appeared to have been crying for a while. He also told Investigator Goetz that Brandy was attempting to feed the victim spaghetti, and it was clear that the victim did not want to eat. In addition, Vernon also stated that Brandy was "mad as hell" that the Defendant was not home because she had to be at work. Vernon said that although he had told Investigator Goetz that he saw the victim on the bed after hearing the "thump," the victim was actually on the floor as the Defendant was in the bathroom getting a wash rag. He acknowledged telling Investigator Goetz that he believed the victim was fine at that time. Vernon also told Investigator Goetz in 2015 that he believed then, and still currently believed, that the victim was already injured when he saw Brandy with the victim when he came home from work that day around 12:30 or 12:45 p.m. because the victim's "behavior was different."

Vernon acknowledged that, during his 2001 interview with Detective Brady, he never mentioned that the victim was upset or crying when he got home from work and never said anything about the victim appearing to be injured or hurt when he got in from work. He admitted that he asserted those specific details about the victim being upset and injured for the first time during his interview with Investigator Goetz in 2015. He claimed he thought he said those things to Detective Brady in 2001 but apparently did not. He also said he told Detective Brady in 2001 that the floor of the mobile home where the victim was injured was a wooden floor with carpet on top. Vernon reiterated that after Brandy left and the Defendant returned, he heard a "thump" and a little cry and when he went to check on the victim, he heard the Defendant talking to the victim, who seemed okay, and the Defendant told Vernon that he had everything under control. Vernon acknowledged telling Detective Brady in 2001 that Cody was not in the room with the victim.

- 15 -

Vernon said he assumed that the victim fell off the bed because he "heard a thump," even though no one told him that was what happened. He also reiterated his testimony at trial that he believed the victim was on the floor.

Vernon acknowledged that he did not have an explanation for why he just testified that the victim was upset, fussy, and would not eat when Vernon got home from work but only told Detective Brady in 2001 that Brandy fed the victim spaghetti and did not mention that the victim as upset, hurt, or fussy. Vernon said, "I don't know why I missed that."

On cross-examination, Vernon claimed that Detective Brady never asked him in 2001 whether the victim was fussy that day. Vernon stated that after hearing the thump, he never saw any bleeding or any indication that the victim had gotten hit in the head. He also never heard any sound like the crack of a skull when the thump occurred. Vernon claimed that Cody went into the bedroom just before he did, and the victim was sitting on the floor and appeared to be fine while the Defendant was in the bathroom.

Vernon said that although the victim ate the spaghetti that Brandy was feeding him, the victim did not act like he wanted it because he was "trying to spit it back up," which was not normal for him. He stated that he was concerned when the Defendant later informed him that he could not get the victim to wake up. Vernon said that although he and his mother tried to awaken the victim, they were unable to do so. He asserted that the Defendant loved the victim and that he had never observed the Defendant being mean to the victim in his presence. Vernon acknowledged that while he was in Huntsville, he had no idea that the police were investigating a possible murder of the victim. He said the detectives in Huntsville just asked him what happened and asked only a few follow-up questions. He said these detectives came to his home later the same morning, but they never put up any crime scene tape to keep people out of that room and never told him to stay out of that room. He said the detectives never arrested anyone in his family that day.

On redirect examination, Vernon said that while Brandy was feeding the victim, the victim "was crying a lot" and was resting his head on Brandy's shoulder, and Brandy said that the victim had "got[ten] in trouble earlier." He said that, when questioned in Huntsville, neither he nor the Defendant felt that the detectives were treating them as suspects.

Detective Jason Fogle with the Maury County Sheriff's Department testified that he and Lieutenant Jim Brady interviewed the Defendant, Vernon Goodwin, and Brandy Eddlemon around 5:00 a.m. on January 21, 2001. The following Monday, Dr. Charles Harlan informed Detective Fogle that he was ruling that the victim's death was accidental. By mid-afternoon, the case was closed because it was determined to be an accidental fall.

- 16 -

Detective Fogle said that the Defendant was detained and interviewed on January 21, 2001, at the Huntsville Police Department. He noted that the Defendant's interview was recorded. Detective Fogle said the Defendant told them that he had come home around 2:00 p.m. on January 20, 2001, that around 2:30 p.m. Brandy Eddlemon left for work and left the victim in the care of the Defendant, that the Defendant laid the victim down with him in the bed around 3:00 p.m., that the victim began sweating so the Defendant went to the bathroom to get a rag to wash his head, that the Defendant heard a thump, and that Cody came around the corner and said that the victim had fallen off the bed. The Defendant said that he found the victim sitting on the floor crying so he picked him up, checked him out, and they laid down on the bed together and went back to sleep. The Defendant later woke up and put the victim in his playpen. Later, the Defendant said that Brandy called to remind him to give the victim medicine for his cold and when the Defendant attempted to wake up the victim, he was unable to do so. The Defendant called his father in the bedroom, and they both had difficulty waking up the victim. They called 9-1-1, and after getting Vernon's mother to check on the victim, they all decided that the victim needed to go to the hospital. Detective Fogle said the Defendant told him they did not have time to wait for the ambulance, so they drove the victim in their own car to the Maury Regional Hospital.

Detective Fogle also said that he and Lieutenant Brady interviewed Vernon Goodwin and that this interview was also recorded. Vernon told them he had come home from work at noon or 12:30 p.m. and Brandy was getting ready to leave for work and was trying to feed the victim some lunch. Vernon said that his grandson Cody was also present. Vernon said he and Cody had lunch and then laid down in a recliner to watch television. Around mid-afternoon, Vernon said that he heard a thump and the victim whimper, and he heard the Defendant talking. Vernon got up, went into the bedroom, and saw the Defendant lying back down on the bed with the victim. He said that when the Defendant attempted to give the victim his medicine, the Defendant called to him because he could not get the victim awake. When they were unable to get the victim awake, they called Vernon's mother to come down to check on the victim, they called 9-1-1, and then they later brought the victim to the hospital in their own vehicle.

Deputy Fogle said they also interviewed the victim's mother, Brandy Eddlemon, in Huntsville. He and Lieutenant Brady then drove to the Goodwins' and the Defendant's home located on Gene Fitzgerald Road in Maury County, Tennessee, although they did not find anything notable there. Deputy Fogle said that the following Monday morning, he and Lieutenant Brady met with Dr. Harlan. They showed him the photographs they had taken of the home on Gene Fitzgerald Road, and Dr. Harlan reviewed some of the statements that had been made before he ultimately concluded that the victim's death was "an accident from an accelerated fall." When Lieutenant Brady informed Dr. Harlan that the victim's fall was never really described that way, Dr. Harlan began giving him different

formulas and explaining "how acceleration creates so much force." He said that after meeting with Dr. Harlan, Detective Fogle and Lieutenant Brady returned to the home on Gene Fitzgerald Road because Linda Goodwin had informed them of some dust displacement on the top of the dresser. Several photographs that were taken at this address were admitted into evidence. After leaving the home the second time, Lieutenant Brady called the assistant district attorney and talked to him about what Dr. Harlan had said, about the witness statements, and about their investigation, and the assistant district attorney made the decision to close this case by Monday afternoon.

Detective Fogle said that while he was "surprised at the autopsy result," he had "a lawyer, a doctor, and [his] boss of [twenty] years of experience . . . giving [him] direction on closing the case and so that's what was done." However, Detective Fogle believed that "more work should have been done" with the case. He stated, "Knowing everything that I know now, both with experience and things that have happened with Dr. Harlan . . . I would keep working the case and find a way . . . around . . . an autopsy I didn't agree with." He added, "At that time, . . . I didn't know you could do that."

On cross-examination, Detective Fogle said that after the district attorney's office recommended that Dr. Harlan conduct the victim's autopsy, he called Detective Roe in Huntsville, who had been conducting her own investigation. Detective Fogle acknowledged that he and Lieutenant Brady had already formed an opinion, based on the inconsistent statements they had obtained, that the Defendant committed a crime against the victim, but they did not have enough proof to arrest the Defendant. A recording of Brandy Eddlemon's statements to Detective Fogle was played for the jury and admitted as an exhibit.

Detective Fogle acknowledged that he allowed the Defendant, the Defendant's parents, and Brandy Eddlemon to return to Tennessee and never told the Defendant to stay out of the bedroom, which was a crime scene. At the time, he and Lieutenant Brady did not believe the victim hit the bedrail on the way down to the floor. He said that while they did not believe that the victim sustained his head injury from the short fall from the bed, they did not know how or when the victim's injury occurred.

Detective Fogle said that in 2015, Investigator Goetz asked him about his participation in the victim's case, and Detective Fogle told him that he believed the Defendant was guilty because Dr. Harlan's autopsy was incorrect. He admitted there was no evidence that the Defendant, Vernon Goodwin, Linda Goodwin, or Brandy Eddlemon could tell the victim had suffered a head injury.

On redirect examination, Detective Fogle identified the Defendant's written statement, and this statement was admitted into evidence. He asserted that he did not have

enough evidence to charge the Defendant in this case because after a day and a half the district attorney's office ordered him to close his investigation. Detective Fogle stated that Lieutenant Brady was not present to testify at this trial because he passed away three years prior.

Investigator Tommy Goetz, the chief criminal investigator with the district attorney's office for the 22nd judicial district, testified that he began working on the victim's case in December 2014 when General Brent Cooper gave him the file from the TBI and asked him to re-look at the investigation in this case. Thereafter, Investigator Goetz spoke with Dr. Podgorski and then reviewed medical records from Dr. Podgorski and Dr. Pickett. He also reviewed the victim's medical records from Maury Regional Hospital and Huntsville Hospital but was unable to review any x-rays, CT scans or MRIs because those hospitals had purged that imagery. He then attempted to speak to Brandy Eddlemon in early 2015, but she declined to meet with him. He then interviewed Vernon, Linda, and Cody Goodwin at their home in 2015 and later spoke to Vernon one or two more times. A few days later, Investigator Goetz interviewed the Defendant and then later spoke to the Defendant two more times.

Investigator Goetz then contacted Dr. Lowen and Dr. Lewis and asked them to review the files in this case to determine if a second autopsy for the victim was warranted. Eventually, the victim's body was exhumed and the second autopsy performed, which Investigator Goetz witnessed. He also talked to Dr. Li following the second autopsy and reviewed Dr. Li's autopsy report.

Investigator Goetz focused on Brandy and the Defendant as his primary suspects in the victim's death because they were the only two individuals who could have caused the victim's injuries. He said he eventually shifted his focus away from Brandy after the medical evidence suggested that the victim's injuries occurred after Brandy left for work on January 20, 2001. He stated that several doctors he spoke to indicated that the Defendant's statements were "not possible, plausible."

Investigator Goetz asserted that the Defendant provided a statement in 2015 that was mostly consistent with his 2001 statement. In both statements, the Defendant said he was not in the room when he heard a thump and that Cody, who was standing in the doorway to the bedroom, told him the victim fell off the bed. Thereafter, Investigator Goetz then confronted the Defendant with the differences between his statement and Vernon's statement, specifically that Vernon said the Defendant was alone in the room with the victim when the "thump" occurred, and the Defendant once again denied being in the room with the victim when the victim allegedly fell. Investigator Goetz said it was very common for a suspect to claim that they were outside the room when an incident occurred.

Investigator Goetz later obtained a wiretap for the Defendant's phone and Eddlemon's phone. He said that while there were no pertinent calls from Eddlemon's phone, there were pertinent calls between the Defendant and his parents.

On June 17, 2019, Investigator Goetz interviewed the Defendant and advised him of his Miranda rights. During this interview, he told the Defendant what the doctors were saying about the case, what the statements showed, and what the autopsy reports established. When Investigator Goetz accused the Defendant of being responsible for hurting the victim, the Defendant denied it. Although Vernon put the Defendant in the room with the victim after the thump, the Defendant claimed during the June 17, 2019 interview that he was outside the bedroom when the victim apparently fell. He said he was deliberately putting pressure on the Defendant during the interview so that the Defendant would later make some incriminating statements on the phone that was being wiretapped.

Later in the day on June 17, 2019, the Defendant had a telephone conversation with Linda Goodwin, wherein the Defendant told her that he and Vernon were "not telling the same story," and Linda said that she was going to talk to Vernon." During another telephone conversation, Linda told the Defendant that she had talked with Vernon and that Vernon "agrees" with the Defendant. Vernon then got on that telephone call and said he was going to speak with Investigator Goetz and "set [him] straight" so the Defendant did not need "to worry about it."

On June 18, 2019, Investigator Goetz met with Vernon Goodwin. During this interview, Vernon's explanation for what happened at the home differed from the story he had provided to Investigator Goetz several months earlier. In this second interview, Vernon asserted that he "heard the thump" and went into the bedroom and saw the Defendant sitting on the bed holding the victim, who was facing outward, while the victim played with a toy. Vernon said that "everything was fine[,]" and he left the bedroom.

Investigator Goetz said the details of Vernon's account of what happened changed from the first to the second interview. He said that Vernon had previously told him that when he pushed the door to the bedroom open, the Defendant was standing, holding the victim and consoling him and Vernon believed everything was okay, and he and Cody returned to the living room. During the interview on June 18, 2019, Vernon said the victim was "more alert and responsive," and the Defendant was sitting on the bed rather than standing. In addition, during the second interview, the Defendant was not consoling the victim, and the victim was faced out and playing with a toy. Investigator Goetz asserted that Vernon's testimony at trial was a third version of events that Investigator Goetz had never heard before, which included Vernon seeing the victim unable to hold his head up at the table with Eddlemon, later hearing a thump, Cody going in the bedroom before Vernon,

and Vernon observing the victim on the floor, sitting up, and that the victim turned and looked at Vernon while the Defendant was in the bathroom getting a rag.

On cross-examination, Investigator Goetz stated that during the July 30, 2019 controlled call between Eddlemon and the Defendant, the Defendant somewhat reiterated his earlier version of events, wherein he claimed he thought the victim injured himself by falling off the bed. During this controlled call, the Defendant claimed the victim made "a hell of a thump" when he fell.

Investigator Goetz said that during the 9-1-1 call on January 20, 2001, the operator asked what was wrong, and the Defendant did not say the victim fell out of the bed; he only said he could not wake the victim up and that it was like the victim was knocked out. At the end of this phone call, the Defendant said that they were going to take the victim to the hospital. He confirmed that the victim arrived at Maury Regional Hospital at 7:06 p.m. and that at 8:32 p.m., the victim arrived at Huntsville Hospital. Detective Goetz said that by 12:50 a.m. on January 21, 2001, the victim had died. Detective Goetz said that he reached a conclusion in 2019 that the Defendant had committed crimes against the victim based on the medical proof and the statements of the Defendant and Vernon Goodwin.

Dr. James Lauridson, a medical doctor board certified in internal medicine, anatomic pathology, and forensic pathology, was accepted as an expert in the field of forensic pathology. Dr. Lauridson said that Brandy Eddlemon asked him to be present for the victim's exhumation and second autopsy. He noted that all of the victim's internal organs, including the brain, were removed during the first autopsy but that the victim's head was surprisingly well-preserved. He was able to observe where bruising occurred under the victim's scalp and where an impact had occurred. He stated that the victim had a "complex fracture . . . where there was an impact and the skull broke radiating out from that impact." He said this would happen if a skull was "struck in a certain place hard enough." Dr. Lauridson agreed with Dr. Li that the victim sustained a blunt injury to the skull and that the manner of the victim's death was homicide. He also agreed with Dr. Li that the circumstances of the victim's death were "[a]ssault by other(s)." Although Dr. Li opined that the victim suffered multiple blunt trauma as his cause of death, Dr. Lauridson concluded that the victim's fracture occurred as a result of "one strike" to the skull with "radiating fractures from this one point."

Dr. Lauridson disagreed with many of Dr. Harlan's conclusions in the first autopsy. He disagreed with Dr. Harlan's opinion that the victim's cause of death was a subdural hematoma. Instead, Dr. Lauridson opined that the victim's cause of death was the "injury to the brain itself" and that the subdural hematoma "is an indicator that there ha[d] been a big enough strike to the head that the brain, the interior of the brain, [wa]s injured" and this injury caused the brain to swell.

- 21 -

Dr. Lauridson also disagreed with Dr. Harlan's finding that the manner of the victim's death was accidental. Dr. Lauridson explained that "falls in [fifteen]-month-old children don't cause these kind[s] of fractures." Instead, Dr. Lauridson concluded that the victim's manner of death was homicide.

Dr. Lauridson noted that Dr. Harlan had found that the victim had "tan mush" in the stomach, which contained sliced mushrooms, ground beef, and bread. He asserted that a child with a complex skull fracture would not be able to eat after sustaining that injury because the child had suffered a "severe enough trauma to break the bone of the skull and to disrupt brain function."

Special Agent Nathan Neese with the TBI testified he met several times with the district attorney's investigator, Tommy Goetz, to review the facts and circumstances of this case before becoming, on June 13, 2019, the affiant on a wiretap certification for the Defendant's phone and Brandy Eddlemon's phone.

On cross-examination, Special Agent Neese acknowledged that the victim's body was exhumed in 2017 and that following this exhumation, no one was arrested. He stated that the 2019 wiretapping, which included calls and text messages between the Defendant and his mother, between the Defendant and his current wife, and between the Defendant and Brandy Eddlemon was done as a last-ditch effort to exhaust investigative leads.

Dr. Gary Podgorski, a diagnostic radiologist at Maury Regional Medical Center, was accepted as an expert in the field of diagnostic radiology. He testified that he examined X-rays and a CT scan of the victim at the hospital on January 20, 2001, and determined that the victim had an "extensive" occipital fracture that began at the base of his skull and continued to the top of his skull. He noted that the victim had "an obvious bleed" on his brain, which was a brain hemorrhage, as well as a subdural hematoma, which is "a collection of blood that can put pressure on the brain."

Dr. Podgorski stated that a subdural hematoma occurs when there is a pooling of blood in the brain, which pushes and puts "pressure on the brain." He explained that a subdural hematoma indicates a "traumatic injury." Dr. Podgorski asserted that an occipital fracture on a fifteen-month-old child was "highly unusual" because such fractures rarely occurred by accident, which made him suspicious that this injury resulted from abuse. He opined that a fall from a bed would have been unlikely to cause an occipital fracture.

On cross-examination, Dr. Podgorski acknowledged that he was not able to tell based on the X-rays and CT scan how the incident involving the victim occurred, when it occurred, or who was responsible for it. He said that the process of the blood pooling in

the brain could take hours but "would start promptly." Dr. Podgorski stated that the victim's emergency room medical records indicated that two law enforcement officers were notified that the victim's injuries were the result of "possible child abuse."

Dr. Joel Pickett, the neurosurgeon who operated on the victim at the Huntsville Hospital, was accepted as an expert in the field of pediatric neurosurgery. He said he received information from the pediatric intensivist that the victim had fallen from a bed to the floor and that although the victim "initially seemed okay," the victim became "unresponsive" a couple of hours later. Dr. Pickett said that he was told the victim fell from the bed at 3:00 p.m. and that Dr. Pickett began treating the victim close to 11:00 p.m.

Dr. Pickett said the victim was intubated and had "no signs of brain function." The victim was not breathing, had a body temperature of eighty-nine degrees, had very low blood pressure, had "just the faintest of pulses," and was "barely alive." After examining the victim's CT scan, he saw that the victim had a "large subdural hematoma." He immediately took the victim to the operating room, where he removed a portion of the victim's skull and removed the blood from the hematoma. During surgery, he observed that the victim's brain "did not appear normal" and was "very blanched[,]" which indicated that it was not receiving any blood flow at all.

Dr. Pickett said that after the victim was resuscitated and given epinephrine, the victim's blood pressure rose, and the victim's brain began to "swell profusely," which required Dr. Pickett to quickly suture the victim's scalp. He stated that he had to leave part of the skull unattached under the scalp to allow the victim's brain to continue to swell.

Dr. Pickett stated that the victim's heart went into "electromechanical dissociation" following surgery and was no longer pumping blood, which caused the victim to pass away. He recorded the victim's time of death at 12:50 a.m. on January 21, 2001. In completing the victim's death certificate for the state of Alabama, Dr. Pickett identified the victim's manner of death as "[p]ending investigation." Dr. Pickett noted that there were no cuts or noticeable injuries on the outside of the victim's head.

Dr. Pickett identified the victim's death certificate from Tennessee, wherein Dr. Charles Harlan stated that the victim's manner of death was "accident." Dr. Pickett said that Dr. Harlan contacted him regarding the victim's autopsy. At that time, Dr. Harlan told him he believed the victim's death was accidental and that the victim's injuries were consistent with a fall from the bed. However, Dr. Pickett told Dr. Harlan that a fall from a bed did not provide "enough acceleration to cause this kind of head injury." He added that the victim's injuries would not happen to a child that age from a short fall from the bed to the floor, even if the child hit his head on a metal bed frame. Dr. Harlan asked Dr. Pickett to change the death certificate, which Dr. Pickett refused to do because he disagreed with

Dr. Harlan's conclusion that the manner of the victim's death was accidental. Thereafter, Dr. Harlan completed a Tennessee death certificate for the victim showing that the victim's manner of death was "accident."

Dr. Pickett opined that the victim had "a severe and extensive head injury." He said that what bothered him about the victim's case was "the height of the fall as it was reported to [him]," which was "all secondhand[,]" and the fact that a fall from a bed "was not sufficient to result in this magnitude of a head injury." He asserted that the victim's injury was consistent with "a high impact injury, such as falling off the top bunk of a bunk bed or being hit by a car."

Dr. Pickett asserted that this injury would have "immediately" affected the victim. He said the victim would have been unable to eat or to drink from a sippy cup following this injury. He added the victim would have been unable to play following this injury and would probably have been unconscious. Dr. Pickett said the trauma from a subdural hematoma generally would "immediately" incapacitate an individual, but the individual could "get worse."

Dr. Pickett opined that "time is of the essence with an acute subdural hematoma" and that there was a very small window in which to treat this injury. He asserted that "the longer that . . . time goes on, the less likely someone is to survive an injury of that nature." He noted that because he did not "have a crystal ball," he could not "say with certainty" whether operating on the victim or treating the victim earlier would have saved the victim's life. However, he asserted that had the victim been seen within an hour of his injury and had he been operated on quickly, this "certainly would have improved his outcome and his chances of survival." Dr. Pickett said, "[A]ny time that exceeds four hours with a large acute subdural hematoma in human beings, the chances of survival [were] almost nil." He added that the victim was treated "well beyond that four[-] hour mark." Then Dr. Pickett stated,

> And so[,] would [the victim's] chances have been better if he had been seen within an hour of his injury and operated on very quickly? It certainly would have improved his outcome[,] and his chances for survival would be much higher. But can I guarantee you that he would have been okay today? No, I can't do that.

Dr. Pickett acknowledged that he testified in Hickman County in 2001 at the hearing to exhume the victim's body for a second autopsy. He recalled testifying that the victim had "considerable swelling in the left hemisphere of the brain, more so that the mass effect of the subdural hematoma would account for," which denoted "a severe and extensive head injury." When asked if, now twenty years later, he still believed that the victim had

suffered a severe and extensive head injury, Dr. Pickett replied, "Unquestionably." Dr. Pickett also said that he testified during the 2001 hearing that the victim's skull was sent to pathology, and it was confirmed that the victim had a normal skull. He also agreed that he testified at the 2001 hearing that the victim's head injury was not consistent with a fall from a bed. In addition, during his 2001 testimony, Dr. Pickett referenced one study where ninety percent of children who had a subdural hematoma were found to be "non-accident trauma" and a second study from Wales that concluded that eighty-two percent of children two years of age or less who had subdural hematomas were determined to be caused by child abuse. Dr. Pickett agreed he testified at the 2001 hearing, "If you have a child that's less than two years of age and [suffers] non-vehicular trauma and they have a subdural hematoma without a clear, high-impact fall, then I think the injury deserves investigation." Dr. Pickett agreed that acceleration would be needed to cause the victim's injury and that a fall of a foot and a half from a bed is "not that much distance to accelerate."

Dr. Pickett agreed that he provided the following testimony at the 2001 hearing:

Yes, I am an expert. I see kids with head injuries all the time. And I can tell that based on my experience that kids that fall off of Jungle Gyms, kids that fall off the back of pickups, kids that fall off the porch, roll off the bed, it's unusual for a kid to come in with a head injury of this nature with anything less than a high impact energy, such as falling off the top bunk of a bunk bed or being hit by a car.

Dr. Picket then explained what causes an acute subdural hematoma:

[A]n acute subdural hematoma occurs when the head is either traveling at a high rate of speed and suddenly stops, or something else traveling at a high rate of speed suddenly hits the head. In either case, the skull, traveling at a relatively high speed is suddenly stopped but the brain doesn't stop. The brain continues to try to move inside the skull. And it can't because it's contained. So it rolls. And as it rolls inside the brain, it's tearing. And it tears the brain microscopically throughout the brain and it tears little blood vessels that connect the brain to the veins that drain the blood from the [b]rain. And those [to]rn blood vessels begin to bleed and that causes a subdural hematoma. And as it bleeds, [it] takes up more and more space and begins to compress the brain.

And so it's a massive injury. And there's also a great deal of trauma to the brain besides the bleeding because it tears the brain and causes trauma to the brain. That's why the brain swells underneath the blood clot.

- 25 -

So it's a devastating injury and that's why the mortality from acute subdural hematomas and trauma is so high. And it is because of that not only the blood clot and the pressure on the brain but the swelling of the brain.

So that's one end of the spectrum of head injuries. It's the extreme end.

The other end, the concussion, is the very mild end. It would be like comparing a very mild sunburn to being doused in gasoline and set ablaze.

Dr. Pickett stated that he testified in 2001 that the things that could have caused the victim's severe injury were falling off the top bunk of a bunk bed, falling down a flight of stairs, being in a car crash, or falling out of a second story window. He reiterated, "Based on the information that was given to me, the mechanism of injury and the degree of insult that the child had, . . . it did not appear to be an accidental injury to me at all." Dr. Pickett explained that the "magnitude of [the victim's] injury that I saw, I think it would have affected him immediately." He also said that he would not have expected the victim to be able to eat food or drink from a sippy cup after suffering this injury. Dr. Pickett asserted that he would have expected the victim to be unconscious.

On cross-examination, Dr. Pickett stated that with a severe, large subdural hematoma, as in this case, "the trauma renders the person incapacitated immediately" and the person "can get worse" by not breathing. At a minimum, such an injury would render the person "at least stuporous and hard to arouse."

Dr. Pickett stated that both the pediatric intensivist from the Maury County Hospital and the victim's mother told him that she had been informed that the victim had a fall from the bed while she was not present. He did not believe that the victim could have suffered his severe head injury that way and he asked the victim's mother if the victim could have suffered some other trauma during the day, but the victim's mother said she did not know of any other trauma. He explained that "if you have a child that doesn't have a history of high-impact trauma and they have a severe head injury, then it warrants further investigation because the most likely diagnosis, the most likely manner of death under those circumstances is non-accidental trauma." When defense counsel asked if the victim's fall six feet to the ground hitting concrete blocks would have caused the victim's injuries, Dr. Pickett replied, "I wouldn't expect him to be fine after that. I think they would have noticed that he was unconscious and brought him in earlier if that had been the case."

Dr. Pickett acknowledged that given the "magnitude of injury," he would expect the victim "to be unconscious at the time of impact" and "[a]t the very most, very stuporous" and "very hard to arouse." He stated that he did not believe the victim "would [have been]

- 26 -

alert enough to be irritable"; instead, he believed the victim would be "very solemn, if you could arouse him." Dr. Pickett opined that the subdural hematoma and the resulting closed head brain injury caused the victim's death. However, he acknowledged that the subdural hematoma alone could have caused the victim's death. He confirmed that there was no way to determine the exact time of the victim's injury at this point.

On redirect examination, Dr. Pickett reiterated that there was no other explanation for the victim's subdural hematoma, other than a high-impact situation. He confirmed that "a light blow to the head or a simple tumble and a roll off the bed" would not produce the type of injury sustained to the victim's head. He acknowledged that the victim had no cuts, punctures, or noticeable damage to the victim's head at the impact site.

On recross-examination, Dr. Pickett acknowledged that he did not think a layperson examining the victim's head would think anything was wrong "if the child were awake."

Dr. Feng Li, the chief medical examiner for Metropolitan Nashville and Davidson County, was accepted as an expert in the field of forensic pathology. He stated that although Dr. Harlan completed the victim's first autopsy in 2001, the TBI reopened the case and requested the county to exhume the victim's body and perform a second autopsy in 2017, which Dr. Li completed. He testified that he disagreed with several portions of Dr. Harlan's autopsy on the victim. He also noted the victim's organs, including the brain, had been removed during Dr. Harlan's 2001 autopsy. Dr. Harlan's and Dr. Li's autopsy reports of the victim were admitted into evidence. Dr. Li noted that Dr. Harlan's autopsy report showed that Dr. Harlan found tan mush containing sliced mushrooms, ground beef, and bread in the victim's digestive system. Dr. Li stated that his examination of the outside of the victim's body revealed "no trauma."

While Dr. Harlan found only one skull fracture on the left side of the back of the head, Dr. Li found "multiple skull fractures" on the left and right side of the victim's head. In addition, although Dr. Harlan found that there was a single injury that resulted in the victim's death, Dr. Li opined that the victim's cause of death was "multiple blunt force injuries" on the left and right side of the skull. Moreover, Dr. Li disagreed with Dr. Harlan's determination that the victim's manner of death was an "accident" based on "an accelerated fall" from a shorter distance where the victim struck his head on the edge of a bed rail. Dr. Li said Dr. Harlan based his conclusion of the victim's accidental death on general medical literature and "the Discovery Channel," although Dr. Li asserted that he had never seen a doctor cite the Discovery Channel in an autopsy report. Dr. Li, however, concluded that the victim's manner of death was "homicide" because the trauma suffered by the victim was the result of a "considerable amount of force," not a short fall. Dr. Li opined that the circumstances of the victim's death were from being "assaulted by other(s)."

On cross-examination, Dr. Li acknowledged that the fractures on the victim's skull could have been caused by one impact or more than one impact. Dr Li stated that it was "[v]ery unlikely" that a simple fall from the bed to the bed rail could have generated the "considerable amount of force" necessary to cause the victim's injuries. Dr. Li agreed that he relied on information in Dr. Harlan's first autopsy report that the victim fell from the bed to the bed rail and did not know who had actually given Dr. Harlan this information. Dr. Li also opined that the victim's fall from the back porch to rocks below would not cause this type of injury because such a fall would cause "some skin damage" based on the irregular shape of the rock. When asked why he did not see skin damage on the victim, Dr. Li explained that "if you fall onto [a] flat, hard surface" or you are "hit with a flat, hard surface," sometimes you do not see damage to the skin.

Dr. Li said that the victim's family hired a board-certified forensic pathologist to be present as he conducted the second autopsy on the victim. Dr. Li agreed to the presence of the pathologist hired by the family because he wanted to be "open and transparent" and as a medical examiner, he was "independent." Dr. Li acknowledged that not having the victim's brain for the second autopsy "somewhat" hindered his work, although he said the "trauma [he] examined [was] still there[.]" Although he acknowledged that he could not say when the victim's injury occurred, where the injury occurred, or how it occurred, Dr. Li said that the victim's trauma was "inconsistent" with a fall "from a short distance to the bed rail." He asserted that the "skull factures [he] observed [were] not consistent with the simple fall" and "the force needed to inflict such trauma" was typically caused by "child abuse." He said that he concluded the victim's death was a homicide because he did not have "others say[ing] [the victim] fell from the tree" or was "involved in a motor vehicle accident." Dr. Li acknowledged that he did not know how many times the victim's skull had been cut during surgery.

On redirect examination, Dr. Li said he could tell a difference between a surgical cut through bone and a fracture. In this case, he stated that the surgical cut occurred "away from the skull fracture" and did not go through any part of the victim's multiple fractures. Dr. Li reiterated that he personally observed the victim's multiple skull fractures during the second autopsy.

On recross-examination, Dr. Li said that while the victim had fractures on the left and right of his skull, he did not know whether there was one impact or more than one impact.

Dr. Adele Lewis, the state chief medical examiner for Tennessee, was accepted as an expert in the field of forensic pathology. She testified that she was asked in 2016 to render an opinion as to whether an exhumation of the victim's body would be of use in

determining the cause and manner of the victim's death. In order to form her opinion to grant the exhumation, Dr. Lewis reviewed the victim's medical records from Maury Regional Hospital and Huntsville Hospital as well as Dr. Harlan's autopsy report. She noted that at the time of Dr. Harlan's death, he had lost his license to practice medicine in Tennessee. Dr. Lewis opined that Dr. Harlan's autopsy of the victim was "inadequate" because he should have checked the victim for bleeding around his eyes, because there were no records of any X-rays being performed or the victim's leg cast being removed, and because there were no photographs taken of the autopsy. Dr. Lewis said that while she disagreed with Dr. Harlan's conclusions in his autopsy report, she agreed with Dr. Li's conclusions in his autopsy report.

Based on the severity of the victim's injuries, especially with the victim's skull fractures, Dr. Lewis expected something like a car crash, a fall from a second- or third-story window, or the victim being forcibly struck by an object to be the cause of the victim's injuries. She said the victim's injuries were not consistent with a "non-catastrophic accident." Dr. Lewis opined that "ordinary household falls don't cause injuries this severe or complex" and that the victim's injuries were consistent with an abusive act. Dr. Lewis stated that it was "not plausible" that the victim sustained his injuries from falling two feet from a bed and striking his head on the bed rail on the way down.

Dr. Lewis agreed that time was of the essence when treating brain injuries like the ones sustained by the victim in this case. She referred to the hour between injury and medical intervention as "the golden hour," which is "one of the most important intervals." When asked to consider a hypothetical scenario about the chances of survival for two fifteen-month-old children who received identical injuries to those sustained by the victim but one of these children was taken immediately to Maury Regional Hospital and the other was put back to bed for three-and-a-half hours before being taken to the same hospital, Dr. Lewis said the chances of survival for the child who received immediate medical treatment were higher because "the sooner someone gets medical intervention . . . and relieves the pressure on the brain, the better that is." Dr. Lewis asserted that a child who did not receive treatment for three-and-a-half hours would "[d]efinitely" have bled more into a skull than the child who was treated thirty minutes or even two hours after receiving the injury.

Dr. Lewis opined that a child who received an injury like the victim's would have immediately exhibited physical symptoms. She asserted that a child who received such injuries "would not have appeared normal to even a layperson after sustaining an injury of this severity." She said the child would usually lose consciousness, or their eyes would roll around in their head, or the child would be vomiting, or the child would be sleepy and they could not be awakened." Dr. Lewis maintained that an injury of this severity would affect a child's motor skills, including the ability to reach and pick things up, to eat, and to

drink. She asserted that all of her opinions had been expressed consistent with her experience, her education, and to a reasonable degree of medical certainty.

On cross-examination, Dr. Lewis admitted that she did not know when the victim's injury occurred and did not know how long it took for the victim in this case to be taken to the hospital. She acknowledged that she did not know how many blood vessels in the victim's brain broke or partially tore. She said that because she did not know the rate of how much blood was going into the brain area, she had no way of determining when the victim's injury occurred.

Dr. Lewis said a child receiving this type of injury would be lethargic, sleepy, irritable, or vomiting. However, she acknowledged that a viral infection or the child eating something that did not agree with him could also cause the child to vomit. A child could also be sleepy or lethargic because he had a severe infection or was dehydrated. However, she asserted that in this case the victim's sleepiness or lethargy was caused by his subdural hematoma.

Dr. Lewis said that the medical evidence showed that the victim's head was forcibly struck by an object, the "impact injury," which caused "the bleeding underneath the scalp and the broken bones of the skull." She opined that the victim's "head hit something or something hit the [victim's] head." She asserted that a baseball bat or a wooden board would not necessarily crack open the victim's skin. She claimed that the victim could not have sustained injuries this severe from a fall of six feet because "statistically that just doesn't happen." She added, "We have studied, we have gone back and looked at child abuse injuries and common household fall type injuries[,] and children just don't sustain injuries this severe and extensive from common household falls." However, she acknowledged seeing injuries of this type when a heavy television fell two or three feet onto a child's head.

On redirect examination, Dr. Lewis acknowledged that other than having a massive skull fracture and massive subdural hemorrhaging, a fifteen-month-old child might be occasionally sleepy or irritable or cranky because of their age.

Dr. Deborah Lowen, the Deputy Commissioner of Child Health for the Department of Children's Services and the former director at the child abuse program at Vanderbilt Hospital, was accepted as an expert in the field of child abuse pediatrics. Dr. Lowen first became involved in this case when the district attorney's office asked her to give an opinion about whether it would be appropriate to exhume the victim's body "given the uncertainty and confusion about what was initially done shortly after his death." She reviewed the victim's medical records from both hospitals, Dr. Harlan's autopsy report, and Dr. Li's

autopsy report. Ultimately, Dr. Lowen's June 17, 2015 letter to the district attorney's office was admitted into evidence, which stated:

Having reviewed all of the information provided to me, I have great concerns that this child's death was not the accident it was initially classified as; rather, the medical and investigative evidence is highly concerning for the child being a victim of child abuse resulting in his death. Because he died so quickly after presenting for medical care, a full evaluation, including skeletal survey . . . opthamology examination were not possible before death. The autopsy did not include a postmortem skeletal survey, eye examination, detailed histopathology of his brain or examination of his neck. These evaluations would have been helpful, if not necessary, to accurately determine the cause of his death.

Dr. Lowen opined that Dr. Harlan's autopsy was "shockingly unprofessional and incomplete for a case like this." She stated that it was very rare for child abuse to take place in front of witnesses. Moreover, if the child was too young to speak, this presented additional challenges to discovering abuse. Dr. Lowen said that she had never seen significant head injuries like the one suffered by the victim that were caused by the child falling off the bed. She said she had heard the child-fell-off-the-bed story "hundreds and hundreds of times" and that this story was "an extremely common excuse for . . . severe or life-ending head injuries." She asserted that falls from beds typically did not cause an injury, but if they did, the injury would be "a simple linear skull fracture" that was very different that the victim's skull fracture in this case.

Dr. Lowen said a child's ability to eat without vomiting showed that the child did not have brain swelling. She added that injuries like those sustained by the victim would "[a]bsolutely" have had a deleterious effect on a child's motor skills and the ability to reach, grab, drink, focus, and pick up objects. She said she would expect symptoms to manifest immediately if a child remained conscious after receiving the type of injuries sustained by the victim. In addition, she said the child would not be acting normally, would be extremely fussy, would not want to eat or drink, and if they did take a few sips, the child might vomit, and would not be running around or playing with toys.

Dr. Lowen asserted that "any caregiver" around a child with these types of injuries would know that the child was "not okay" and would "recognize [that] something [wa]s wrong with this child." She explained that being "fussy" in a typical toddler way was different than exhibiting the symptoms of a child with a head injury.

Dr. Lowen opined that the victim's injuries were not "a typical childhood accidental injury." She said that if such injuries were accidental, there would have been a major

accident of which everyone would have been aware. This would include a car crash where a child was not restrained and hit their head on the door, or flew outside the car and hit their head on the ground, or fell from a second-floor balcony and slammed the back of the child's head on the ground.

Dr. Lowen asserted that it was "not plausible in any way, shape, or form" that the victim sustained his injuries by falling approximately two feet to a carpeted floor. She opined that it would be even less plausible for the victim to sustain his injuries if he fell off the bed and hit his head on the bed rail to a carpeted floor because then that would be a "two-foot fall and broken it up into two smaller falls," which meant that "the force with which [the child] hit the ground has been lessened, has been dampened by the initial striking of the bed rail or the bed frame." However, after being shown a photograph of the bed at issue, Dr. Lowen said that if sufficient force was applied, then the ball on the end of the bed post could cause the type of injuries sustained by the victim. She said that the victim's injuries were "very consistent . . . of an abusive act, given the [victim's] history." She added that after considering other options, a diagnosis of an abusive act was "by far the most likely" in the victim's case.

Dr. Lowen was presented with the same hypothetical as Dr. Lewis. Dr. Lowen opined that the child who received medical treatment immediately had a better chance of survival. She also asserted that the victim would have hemorrhaged more blood into his skull three-and-a-half hours after the injury than he would have if he received treatment thirty minutes to two hours after the injury because the victim had "a hyperacute subdural," which meant that the victim was "actively bleeding" when he arrived in the operating room, a fact that was documented in the "operative report." She also clarified that it was not just the bleeding that caused problems because when the brain swells, it can prevent adequate breathing, which causes "further brain injury."

Dr. Lowen stated that when a child came into the emergency room with a subdural hemorrhage or hematoma, it was not always clear that the child was actively bleeding. She said a CT scan would show a blood clot, but a physician would not know if the child was actively bleeding until the child went into the operating room. Dr. Lowen said the victim's neurosurgeon's notes showed the victim in this case was "still actively bleeding" in the operating room. In particular, she said these notes showed that while "some of the [victim's] blood had clotted," there was "still blood coming into that space actively." Dr. Lowen opined that the victim's active bleeding would have had a deleterious effect on the victim's health. She also clarified that "[m]edical professionals use the word ['non-accidental trauma['] to indicate abuse." She confirmed that all the opinions she had expressed during her testimony were opinions consistent with her professional education and work experience and were stated to a reasonable degree of medical certainty.

On cross-examination, Dr. Lowen reiterated that the victim "had clearly abusive injuries." She added that if someone were to "take the child and slam his head into that bedpost, that could cause some, if not all, of his injuries." She also asserted that the injuries sustained by this victim were "far, far, far outside of any normal accident or injury" and that such injuries took "significant unusual force to occur." She stated that the victim could have sustained his injuries from being lifted up and down onto the floor or being lifted up and slammed down on the round portion of the bed post. Dr. Lowen explained that the victim sustained a "complex skull fracture" with the point of contact being the "right side" of the head. She asserted that she was not paid to testify in this case and that she "consider[ed] it part of [her] job." Dr. Lowen opined that "the brain injury caused the death of [the victim], which was made worse by the subdural hematoma." She reiterated that the victim's injuries "did not come from the child falling off the bed." She added that the medical record showed the victim got hurt from "abuse" but it could not be determined whether a hard object was with force struck against the child's head or the child's head was struck against a hard object.

When asked if she was here to try to convince the jury this was a non-accidental event, Dr. Lowen replied:

> I'm here under subpoena and I have the opinion that [the victim] was a victim of child abuse that resulted in his death. And I agree with the medical examiner [who] called this a homicide. When I said at the very least Dr. Harlan should have called it undetermined, the most accurate ruling should have been that this was a homicide.

She acknowledged that she did not know the time of the victim's injury or whether the victim's injury occurred in the bedroom of the mobile home.

The Defendant offered the following proof at trial. Dr. George Nichols II, a medical doctor with a specialty in pathology and a former chief medical examiner for the Commonwealth of Kentucky, was accepted as an expert in the field of forensic pathology and pediatric trauma. After being contacted by defense counsel, Dr. Nichols reviewed the victim's medical records, the first and second autopsy reports, and various reports, records, and filings connected to the case. Dr. Nichols acknowledged that he never saw the victim in this case and only reviewed records pertaining to the victim. He said that the victim "sustained a head impact" that resulted in "at least a subdural hematoma." He stated that he did not know how many of the victim's blood vessels in the brain were torn or broken or how quickly the blood leaked out of the vessels. Dr. Nichols said that the vessels that were broken were "venous blood rather than arterial blood," which meant that the blood

came out "at a low volume under low pressure[.]" However, he said that he did not know "the rate of bleeding" or whether the victim "formed a blood clot to stop the bleeding in the injured vein." He also said that even if a blood clot formed, we do not know whether there was "re-bleeding from the same injured vein due to clot lysis."

Dr. Nichols stated that the symptoms of a subdural hematoma could include the child being stunned, unconsciousness after the initial impact, the child crying inconsolably, the child being unable to eat or drink, the child being listless or thrashing about, the child developing convulsive movements, the child becoming unresponsive, the child going into a coma, or death. He also noted that vomiting might occur because there was a disturbance of the autonomic nervous system.

Dr. Nichols asserted that there was no evidence that Dr. Harlan recognized identifiable food particles in the victim's stomach at the time of the first autopsy. He claimed that the small amount of "murky fluid" in the victim's gastrointestinal system was representative of the victim "clearly not eating a full meal." Dr. Nichols acknowledged that he did not know when the injury occurred and, therefore, did not know how much time elapsed between the victim's injury and his death. Dr. Nichols said he was involved in Dr. Harlan's medical license revocation proceedings and that he agreed with the decision to revoke Dr. Harlan's medical license in Tennessee.

Dr. Nichols disagreed with Dr. Harlan's findings that the manner of the victim's death was an accident because there was not enough physical proof or investigative proof to tell how the injury happened. He asserted that the victim could have been injured by falling off of a six-foot high porch onto a rock surface. He asserted that all of the victim's skull fractures met at a "single contact point."

Dr. Nichols disagreed with Dr. Li's conclusion that the manner of the victim's death was homicide, instead asserting that the appropriate manner of death was "undetermined" because he did not know how the victim sustained his injury. He claimed that Dr. Li would have had to have some information from an investigator or some other investigative source showing that the death and injury was the result of the act of another person in order to list the manner of death as homicide.

Dr. Nichols said that it "would be almost impossible" for the victim to have received his injuries from falling onto a bed rail, unless the child fell from a height of six to eight feet high. He claimed that during the first autopsy Dr. Harlan should have obtained a neuropathologic consultation on the victim's brain to determine what happened. Dr. Nichols reiterated that the victim had no cuts or abrasions except for the single goose egg behind the victim's left ear.

- 34 -

Dr. Nichols said that if someone were to look at this child after falling off a bed to a carpeted floor below, they would "[n]ot necessarily" recognize that the victim was severely injured. He agreed that he did not know how long it took for the process of the subdural hematoma to show itself as symptoms in the victim, but he acknowledged that the symptoms could take hours to present themselves or could happen very quickly.

On cross-examination, Dr. Nichols stated that if a victim, who was standing up, fell six feet off the porch to rock below, he would expect there to be "[l]inear marks or puncture wounds" to the victim's skin from hitting sharp rocks. Dr. Nichols said that there was "[n]ot a chance" that falling from a twenty-four-inch couch onto a carpeted floor would have provided the type of injuries that ultimately killed the victim.

Linda Goodwin, the Defendant's mother, testified that her mobile home off of Gene Fitzgerald Road had a back porch that was six feet from the ground. She acknowledged that there were so many large rocks on the ground there that they had bulldozer work done and that they "still didn't get rid of all of them." She said she spent approximately fifteen minutes with the victim at 6:00 a.m. on January 20, 2001, and the victim was happy, acting normally, and playing with some toys. When she left the home at around 6:20 to 6:25 a.m., her husband Vernon had already left for work and had taken their grandson Cody to his mother's home on the way to work.

Linda denied ever seeing the Defendant being mean to the victim and claimed the Defendant "loved that child." She stated that Brandy Eddlemon did not adequately supervise the victim and would often "turn him loose" in a room without watching him. She described the victim as a "very rambunctious baby" who could move around, even with his leg in a cast. Linda claimed that after the victim passed away, Brandy Eddlemon refused to hold him. Finally, at Brandy's mother's insistence, Brandy sat down in a chair and held him for a brief time. Linda noted that Brandy did not cry a lot at the victim's funeral. On cross-examination, Linda Goodwin acknowledged that at the time of the victim's death, the Defendant and Brandy Eddlemon had only been dating for around four months.

Amy Harless stated that she first met Brandy Eddlemon when they took classes together at Columbia State, and then they became "[c]lose friends." She said that they visited each other at their homes, their children played together, and she babysat Brandy's children approximately three times. She confirmed that around the time of the victim's death, she and the Defendant "were very good friends." Harless said she never saw any signs that the victim was being abused and never observed the Defendant being mean to the victim.

Harless claimed Brandy told her several different stories about the victim's death. She said Brandy called her from the hospital in Alabama in the early hours of January 21, 2001, and first told her that the victim had fallen before Brandy went to work but the victim "seemed fine." Harless said that in August 2001, she told TBI Agent Tenry about Brandy's statement. Harless said that in 2015, she told Investigator Goetz about Harless's August 2001 statement to Agent Jerry Tenry regarding Brandy's admission that the victim fell before Brandy went to work.

On cross-examination, Harless did not recall telling Investigator Goetz that she did not remember giving the aforementioned statement to Agent Tenry. She said that at the time, she did not know that Agent Tenry worked for the TBI and that she had simply called the district attorney's office, who put Agent Tenry in touch with her, and she and Agent Tenry later spoke over the phone. Harless stated it was approximately seven months after the victim's death when she gave her August 2001 statement to Agent Tenry. When asked if there was a reason she waited seven months, Harless replied that Brandy's story about the victim falling before she went to work "changed several times" and she was "conflicted about it." She confirmed that she and Brandy had not had a disagreement or argument between the time when Brandy made this statement to her about the victim and when Harless reported it to Agent Tenry. Harless acknowledged that she was not present in the Goodwin household in January 20, 2001, and did not personally know what happened to the victim.

Mike Bottoms, who was the district attorney for the 22nd Judicial District for thirty-two years before retiring, testified that he was the district attorney when the January 20, 2001 incident involving the victim took place. He stated that he ordered an autopsy of the victim done in Nashville because of the victim's suspicious death. General Bottoms said that he did not specifically request that Dr. Charles Harlan conduct the victim's autopsy, only that the autopsy be done in Nashville.

General Bottoms asserted that if he had known that Dr. Harlan was incompetent, he would not have allowed him to do the victim's autopsy. He said that at the time of the victim's autopsy, there were no rumors that Dr. Harlan was incompetent. General Bottoms stated that he decided not to pursue the case against the Defendant after he learned that the Defendant was not around the victim at the time the victim broke his leg, that the Defendant had no prior criminal record, that there were children in the Defendant's family who were never hurt, and that the Defendant's father was present the entire time that the Defendant was caring for the victim on January 20, 2001. A short time later, Bob Gafford told him his son had been married to Brandy Eddlemon and that the victim was their child. Gafford asked him to have the TBI investigate the victim's death because Gafford did not want his other grandchild, the victim's older brother, to be in a dangerous situation. Later, Agent Tenry was assigned to investigate the case. Agent Tenry eventually told General Bottoms

about what Harless had said about Brandy's statement that the victim had fallen before Brandy left for work. General Bottoms told Agent Tenry to pursue it, but Agent Tenry did not contact him again about this case. General Bottoms stated that the Department of Health later wanted a second autopsy on the victim because the department had fired Dr. Harlan.

On cross-examination, General Bottoms said that he did not agree to a second autopsy of the victim because he knew that Dr. Levy would disagree with Dr. Harlan about everything and because Brandy Eddlemon was "insistent" that no disinterment of the victim's body occur. He said that he believed that Agent Tenry closed the case on his own because General Bottoms never closed the case.

General Bottoms asserted that he would not have made the decision to call the victim's death an accident unless he really looked at what the investigation showed. He explained that he "just couldn't get comfortable with charging [the Defendant]" with the victim's death because he "didn't have any evidence." While he did not dispute the fact that the victim's case was closed within a day-and-a-half after determining the victim's death was an accident, General Bottoms acknowledged that ordinary investigations into child abuse often went on "for months[.]"

Sergeant James Bryant with the Maury County Sheriff's Department testified that an emergency room staff member at Maury Regional Hospital, perhaps the emergency room doctor, informed him that he had been told that the child had fallen off a bed and hit his head on the metal bed railing. He acknowledged that he did not include this information in his report. Sergeant Bryant confirmed that even though he was told this information about the victim falling off a bed, he did not know if this information was true. He also said that he did not do investigations and that if an investigation was necessary, then he would turn the case over to detectives. He stated that he never saw the victim or any family members that night at the hospital.

The Defendant did not to testify on his own behalf at trial.

In rebuttal, the State offered the following proof. Dr. Lauridson testified that learning the story of how an injury occurred was the "key" as to whether this was an "accident or homicide." He asserted that one needed "to look at the story very carefully" and that a "short fall" did not legitimately explain the victim's injuries. He also asserted that the story of the victim falling onto rocks was not legitimate because if the victim had fallen on a rock hard enough to cause this kind of fracture," then the victim would "have lacerations and tearing of the scalp[,]" which did not occur in this case. He also opined that the story about the victim hitting the rocks "was just too vague for me to buy that . . . given the autopsy findings."

- 37 -

While Dr. Lauridson agreed with Dr. Nichols that the source of the subdural hematoma was the "tearing of the bridging vessels" in the brain, Dr. Lauridson asserted that "to get those bridging veins ruptured requires a very significant force to the head" such that the "inner part of the brain is damaged," which is "where the serious part of this injury occurred." He also noted that although Dr. Nichols implied that the cerebral edema did not happen until neurosurgery in Huntsville, the CT scan done at Maury Regional Hospital showed that there was edema of the victim's brain at that point.

Dr. Lauridson stated that Dr. Harlan's autopsy report said that the victim's gastrointestinal track contained a "tan mush containing ground beef, mushrooms, and bread." Dr. Lauridson confirmed that some foods are digested faster than others. He noted that "mushrooms, for some reason, don't digest as fast as other foods" and confirmed that there had been times when he was able to identify particular kinds of food. Dr. Lauridson said that he did not have any reason to disagree with Dr. Harlan's findings inside the victim's gastrointestinal track because he felt that the objective parts of Dr. Harlan's report were credible, even though many doctors had disagreed with Dr. Harlan's opinion that the manner of the victim's death was accidental.

When asked about Dr. Nichol's disagreement with Dr. Li that the victim's manner of death was homicide, Dr. Lauridson stated the following:

> As I said before, we have the injury. I can tell you for certainty that this is a big impact, enough to break the skull, enough to . . . tear the brain. Okay. That's clear.
>
> So then you have to give me a scenario, a history as to how this happened. That's the key. How did this happen. And the first scenario was a short fall, a fall off a bed or hitting a bed rail or something like that.
>
> The answer is no. That makes it a homicide.
>
> Well, then, if you come up with more stories, you're going to have to have a pretty significant story to make this kind of impact or accident.
>
> So I disagree with Dr. Nichols. I think this is homicide.

Dr. Lauridson also stated that in the order revoking Dr. Harlan's medical license, the Tennessee Board of Medical Examiners stated that the victim's death in this case occurred as a result of "non-accidental trauma."

Brandy Eddlemon also provided rebuttal testimony for the State. Eddlemon stated that Amy Harless was a friend of the Defendant's before Harless was her friend. She stated that her friendship with Harless did not continue through her marriage to the Defendant. When asked if she talked to Harless the day of or the day after the victim passed away, Eddlemon stated, "Not to my recollection, no." Eddlemon denied telling Harless that anything happened with the victim the morning of January 20, 2001, that would have caused the victim's injuries. When asked if she told Harless that the victim was already injured when Eddlemon left for work, Eddlemon replied, "Absolutely not." She confirmed that nothing happened by her or in her presence that could have caused the injury to the victim's head. She also denied taking the victim to the back porch on January 20, 2001.

Eddlemon stated that she was originally uncooperative with Investigator Goetz's investigation in 2015 because the victim had been gone for fourteen years and she had been repeatedly told that the victim's death was an accident. She also said she initially did not want the victim's body to be exhumed because she did not want to bury the victim a second time. However, after Investigator Goetz's investigation progressed, she agreed to have the victim exhumed for the second autopsy.

Lastly, Investigator Goetz provided rebuttal testimony for the State. Investigator Goetz said that Amy Harless originally provided her statement to Agent Tenry on August 1, 2001, which was conspicuously about five days after the second hearing on exhuming the victim's body but before the final order was issued. He stated that he met with Harless on February 27, 2015. When he asked Harless about "the written statement concerning what Brandy had told her," Harless said she "did not recall" making that statement. After he provided the written statement for her to read, Harless acknowledged that she had made the written statement. Investigator Goetz said that he began to question the veracity of Harless's statement after the medical experts opined that the victim's injury could not have occurred before he ate. He confirmed that when he spoke to Harless on February 27, 2015, which was fairly early in his investigation, he felt Brandy Eddlemon was still a suspect in this case.

On rebuttal cross-examination, Investigator Goetz said that because the medical experts stated that the victim would not eat, play, or drink following an impact like this, he concluded that the victim was not injured before he ate.

At the conclusion of trial, the jury acquitted the Defendant in count one of felony murder committed during the perpetration of aggravated child abuse but convicted him in count two of felony murder committed during the perpetration of aggravated child neglect, and the trial court imposed a sentence of life imprisonment.

The Defendant then timely filed a motion for new trial, as well as an amended motion for new trial, alleging in part the same issues that he raises on appeal. Following a hearing, the trial court denied the motion for new trial. The Defendant then filed a timely notice of appeal.

## ANALYSIS

**I.** **Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain his conviction for felony murder committed in the perpetration of aggravated child neglect. He claims there is no proof that he knowingly neglected the victim after his initial injury. He also asserts that there is no evidence that any neglect adversely affected the victim's health or welfare or caused serious bodily injury apart from the initial injury sustained by the victim. In response, the State contends that the evidence is sufficient to sustain the Defendant's conviction. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331

S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child neglect . . . ." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2000). No culpable mental state is required for a conviction for felony murder except the intent to commit the underlying felony, which in this case is aggravated child neglect. Id. § 39-13-202(b) (Supp. 2000). A person commits the offense of aggravated child neglect who "commits . . . child neglect, as defined in § 39-15-401(b) . . . and . . . [t]he act of . . . neglect . . . results in serious bodily injury to the child[.]" Id. § 39-15-402(a)(1) (Supp. 2000). "Serious bodily injury" is defined as bodily injury involving: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Id. § 39-11-106(34) (Supp. 2000).

A person commits child neglect who "knowingly . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Id. § 39-15-401(b). "[B]efore a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." State v. Mateyko, 53 S.W.3d 666, 671-72 (Tenn. 2001). "[T]he mere risk of harm is insufficient to support a conviction." Id. at 667.

First, the Defendant claims that the evidence is insufficient to support a finding that he knowingly neglected the victim. He notes the General Assembly's definition of "knowing":

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b). The Defendant then references State v. Ducker, 27 S.W.3d 889 (Tenn. 2000), to support his claim that the proof was insufficient to establish that he knowingly neglected the victim. In Ducker, the Tennessee Supreme Court considered whether the "knowing" mens rea in the pre-2005 version of the child abuse and neglect statute applied to the conduct of the defendant or to the result of that conduct. Id. at 896. It held "the statute requires that the act of treating a child in an abusive manner or neglecting the child must be knowing conduct." Id. at 897. The court recognized that once

the "knowing" mens rea is established, then "the next inquiry under the plain language of the statute is simply whether the child sustained an injury or, in the case of child neglect, whether the child suffered an adverse effect to the child's health or welfare." Id. The court then concluded that the aggravated child abuse and neglect statute was a nature-of-conduct offense, rather than a result-of-conduct offense, because "the mens rea of 'knowing' refers only to the conduct elements of treatment or neglect of a child" under the statute. Id. at 897. In determining whether the evidence was sufficient to support the conviction, the Ducker court noted that "the defendant knowingly parked her car, rolled up the windows, securely fastened the children in the car, locked the car and left them inside the parked car from approximately 3:45 a.m. to between 12 and 1 p.m. on June 6[,]" and "[t]he children died of hyperthermia." Id. Consequently, the court held the evidence was sufficient to sustain the conviction for aggravated child abuse because the proof supported a finding that "the defendant knowingly and other than by accidental means neglected the children" and that "the neglect adversely affected the children's health and welfare." Id.

Here, the Defendant argues there was no proof that he knew the victim was injured until he attempted to wake the victim up for his medication at 6:00 p.m. He asserts that when he arrived home from Lowe's, the victim was asleep. Shortly after that, he moved the victim out of his playpen and into the bed to take a nap with him. When the Defendant woke up, he realized that the victim had vomited and/or was sweating. The Defendant said he got up and went to the bathroom, and then Vernon Goodwin heard a "thump" from inside the bedroom. An instant later, Vernon and Cody saw the victim on the floor and assumed the victim had fallen off the bed, although the victim was not crying and did not appear hurt. Thereafter, the Defendant put the victim back to bed, where he stayed until the Defendant tried to wake him up for his medication around 6:00 p.m. The Defendant claimed this was the first time he became aware that something was wrong with the victim and immediately called his father and grandmother to help him. The Defendant then asserted that he called 9-1-1 and rushed the victim to the Maury Regional Hospital within roughly an hour of first becoming aware that the victim was ill.

To bolster these claims, the Defendant references the testimony from Dr. Pickett, Dr. Lowen, and Dr. Lewis that there were no noticeable lacerations, wounds, cuts, or punctures on the victim, that someone looking at the victim would likely not know that he was injured, and that the victim's symptoms could have been misunderstood as typical characteristics of a toddler. In light of this medical testimony, the Defendant asserts that it was more than reasonable for him, who did not have children of his own and was not accustomed to caring for children, to not realize that the victim needed medical attention. The Defendant also argues that because the victim was sick and taking antibiotics, he could have reasonably believed the victim's symptoms of being irritable, sleepy, and vomiting were related to his illness. Lastly, the Defendant asserts that he did not knowingly inflict the victim's injuries, as shown by the jury's acquittal of him in Count 1, is further evidence

that he was unaware that the victim was injured. The Defendant argues that because all of these factors indicate that he "did not know that [the victim] was suffering from a head injury" or that the victim "required medical treatment," he did not knowingly engage in child neglect, and the evidence is insufficient to sustain his conviction for felony murder committed in the perpetration of aggravated child neglect.

While the proof was overwhelmingly circumstantial in nature, a rational jury could have found that the Defendant knew the victim had sustained a serious head injury around 3:00 p.m. when Vernon Goodwin heard the loud "thump" from inside the bedroom. The medical proof overwhelmingly established that the seriousness of the victim's head injury would have been immediately apparent to anyone observing the child. Specifically, Dr. Pickett testified that the severity of the victim's injury, which included an extensive skull fracture and a subdural hematoma, would have "immediately" affected the victim and would have prevented the victim from eating, from drinking from a sippy cup, or from playing following this injury, in contrast to what Vernon and the Defendant claimed. In addition, Dr. Lewis testified that a child who received an injury like the victim's would have immediately exhibited physical symptoms and "would not have appeared normal to even a layperson after sustaining an injury of this severity." Dr. Lewis added that the child would usually lose consciousness, or their eyes would roll around in their head, or the child would be vomiting, or the child would be sleepy and they could not be awakened"; she also asserted that an injury of this severity would affect a child's motor skills, including the ability to reach and pick things up, to eat, and to drink. Dr. Lowen also testified that injuries like those sustained by the victim would "[a]bsolutely" have had a deleterious effect on a child's motor skills and the ability to reach, grab, drink, focus, and pick up objects, and she asserted that "any caregiver" around a child with these types of injuries would know that the child was "not okay" and would "recognize [that] something [wa]s wrong with this child." Dr. Lowen clarified that being "fussy" in a typical toddler way was different than exhibiting the symptoms of a child with a head injury. Dr. Lowen also opined that the victim's injuries were not "a typical childhood accidental injury" and that if such injuries were accidental, there would have been a major accident about which everyone would have been aware, including a car crash where a child was not restrained or a child's fall from a second-floor balcony and where the back of the child's head slammed on the floor. The record is devoid of any proof indicating that another incident or accident caused the victim's severe head injury, and because the medical experts testified that the victim's severe injuries would have been immediately apparent to anyone, the proof established that the Defendant was the only person with the victim at the time he could have been injured. The jury then could have reasonably inferred that the Defendant, upon realizing the victim had sustained a severe head injury at 3:00 p.m., deliberately delayed seeking medical treatment for the victim for approximately four hours. Accordingly, we conclude that the State presented sufficient evidence that the Defendant knowingly neglected the victim by

failing to obtain prompt medical treatment after the victim sustained a serious head injury around 3:00 p.m. on January 20, 2001.

Second, the Defendant asserts that the evidence is insufficient to support a finding that the alleged neglect adversely affected the victim's health and welfare or resulted in serious bodily injury apart from the initial injury. He asserts the State must prove that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse. See Mateyko, 53 S.W.3d at 671-72 (stating that "a mere risk of harm in the neglect context is . . . insufficient" and that "before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare"); State v. Brock, No. E2009-00785-CCA-R3-CD, 2011 WL 900053, at *6 (Tenn. Crim. App. Mar. 16, 2011) (concluding that the evidence was insufficient to sustain the defendant's two convictions for aggravated child neglect because the record was "devoid of any evidence that the victim suffered further harm or injury subsequent to the initial abuse"); State v. Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *11 (Tenn. Crim. App. Apr. 26, 2010) (concluding that the evidence was insufficient to sustain a conviction for aggravated child neglect because the proof failed to show that Barlow's delay in seeking medical care for the victim caused additional brain damage when the medical experts testified generally to the risk of continued swelling of the brain but the proof failed to establish an actual, deleterious effect on the victim caused by the delay); State v. Dewitt, No. M2015-00816-CCA-R3-CD, 2016 WL 6638857, at *11 (Tenn. Crim. App. Nov. 10, 2016) (reversing and vacating the conviction for aggravated child neglect after concluding that there was no proof "concerning what effect, if any, the [d]efendant's failure to inform the victim's parents or seek prompt medical care had on the victim's injuries" and "no proof that the victim suffered any injury after the initial trauma or that her condition worsened due to the passage of time").

The Defendant also contends that this court has consistently found insufficient evidence to uphold a charge of aggravated child neglect where the record did not establish that the delay in seeking medical treatment adversely affected the victim's health or resulted in serious bodily injury apart from the initial injury. See State v. Raymundo, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *15 (Tenn. Crim. App. Nov. 10, 2010) (reversing and vacating the conviction for aggravated child neglect because the State failed to show that the defendant's delay in obtaining medical attention for the victim had an 'actual, deleterious effect' on the victim's health and where no proof indicated that the victim "collapsed" from other causes besides the act of abuse that caused the victim's internal injuries); State v. Wiggins, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *5 (Tenn. Crim. App. Nov. 2, 2007) (concluding the evidence was insufficient to sustain the conviction for aggravated child neglect because the proof established that it was the defendant's "act of abuse which produced the serious bodily injury to the victim" not the

defendant's "act of neglect, or failure to seek medical treatment, which <u>resulted</u> in serious bodily injury"); <u>State v. Dykes</u>, No. E2001-01722-CCA-R3-CD, 2002 WL 1974147, at *6-7 (Tenn. Crim. App. Aug. 16, 2002) (reversing and vacating the defendant's conviction for aggravated child abuse through neglect after concluding that there was "no proof in the record that the defendant knew [the victim] was injured and delayed seeking treatment for those injuries such that serious bodily injury resulted").

The Defendant notes that when Dr. Pickett was asked whether he could have saved the victim if he had operated on him sooner, Dr. Pickett replied, "I don't have a crystal ball and I can't—I can't, you know, say with certainty whether or not that would have made a difference." He asserts that while Dr. Pickett asserted that the victim's chances of survival may have been higher if he had been seen sooner, Dr. Pickett also acknowledged that he could not guarantee that there would have been a different outcome. The Defendant also asserts that although Dr. Lewis testified generally that the sooner someone receives medical treatment, the better, Dr. Lewis failed to specifically testify whether earlier treatment would have made a difference in this case. The Defendant asserts that while the medical experts spoke "generally to the mere risk of continued bleeding in the brain and that time is of the essence[,]" the medical testimony "f[ell] short of establishing that the outcome would have differed had medical treatment been sought sooner." Consequently, the Defendant argues that the State failed to show that the delay caused an "actual, deleterious effect," which resulted in additional bodily injury to the victim.

Despite the aforementioned claims, we conclude that a rational jury could have found that the Defendant's delay in seeking medical treatment after the victim's initial head injury caused the victim's separate injury of brain damage, which ultimately caused the victim's death. Dr. Pickett testified that if the victim had been seen within an hour of his injury and had been operated on quickly, it "certainly would have approved his outcome and his chances of survival." Dr. Pickett also stated that "any time that exceeds four hours with a large acute subdural hematoma in human beings, the chances of survival [were] almost nil" and that the victim was treated "well beyond that four[-]hour mark." Dr. Lewis testified that a child who did not receive treatment for three-and-a-half hours would "[d]efinitely" have bled more into a skull than the child who was treated thirty minutes or even two hours after receiving the injury. Dr. Lowen also stated that the victim would have hemorrhaged more blood into his skull three-and-a-half hours after the injury than he would have if he received treatment thirty minutes to two hours after the injury because the victim had "a hyperacute subdural," which meant that the victim was "actively bleeding" when he arrived in the operating room, a fact that was documented in the "operative report." Dr. Lowen also concluded that the victim's active bleeding would have had a deleterious effect on the victim's health. Dr. Lowen added that it was not just the bleeding that caused problems because when the brain swells, the swelling itself can prevent adequate breathing, which causes "further brain injury." Based on this proof, a rational jury could have

determined that the Defendant's neglect—namely his more than four-hour delay in taking the victim to the Maury County Regional Hospital—caused a completely separate injury, namely the victim's brain injury as his brain swelled within the confines of his skull. The evidence shows that the Defendant's neglect in obtaining prompt medical treatment caused the victim's severe brain injury and death, which constitutes "an actual, deleterious effect or harm to the child's health and welfare[.]" See Mateyko, 53 S.W.3d at 667. Therefore, we conclude that the evidence is sufficient to sustain the Defendant's conviction for felony murder committed in the perpetration of aggravated child neglect.

**II.  Denial of Motion to Suppress.**  The Defendant contends that the trial court erred in denying his motion to suppress statements made to police during an illegal and coercive interrogation. He asserts that because he never voluntarily provided his statement to Investigator Roe at the hospital, his initial statement should be suppressed. He also contends that his later statements to law enforcement should be suppressed as "fruit of the poisonous tree" because the officers relied on information improperly obtained by Investigator Roe in conducting their interviews of the Defendant. In response, the State asserts that the trial court properly denied the Defendant's motion to suppress. We conclude that because the record fully supports the trial court's denial of the suppression motion, the Defendant is not entitled to relief.

When this court reviews suppression issues, the prevailing party in the trial court "'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). "'Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" Id. (quoting Odom, 928 S.W.2d at 23). A trial court's findings of fact in a suppression hearing will be upheld, unless the evidence preponderates against them. Id. (citing Odom, 928 S.W.2d at 23). However, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. Id. (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)). When evaluating the correctness of a trial court's ruling on a motion to suppress, this court may consider the entire record, including not only the proof offered at the suppression hearing but also the evidence presented at trial. State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V; see U.S. Const. amend. XIV, § 1. Similarly, the Tennessee Constitution provides "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."

Tenn. Const. art. I, § 9. Both the Fifth Amendment and article I, section 9 provide the criminally accused the right against compelled self-incrimination. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998).

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court created procedural safeguards to protect against compulsory self-incrimination. Miranda compels law enforcement to warn an individual prior to a custodial interrogation:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. The opportunity to exercise the aforementioned rights must be afforded to the individual throughout the interrogation. Id. After these warnings are given and an opportunity to exercise these rights is afforded, the person being questioned may "voluntarily, knowingly and intelligently" waive these rights and make a statement. Id. at 444, 479; Echols, 382 S.W.3d at 280; State v. Mann, 959 S.W.2d 503, 529 (Tenn. 1997).

Because "coerced confessions are inherently unreliable," only voluntary confessions are admissible. State v. Climer, 400 S.W.3d 537, 567 (Tenn. 2013). In order for a statement to be voluntary, it "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

Whether a confession is involuntary is a question of fact. State v. Willis, 496 S.W.3d 653, 695 (Tenn. 2016) (citing State v. Sanders, 452 S.W.3d 300, 305 (Tenn. 2014)). The State has the burden of establishing the voluntariness of a confession by a preponderance of the evidence. Id. (citing Sanders, 452 S.W.3d at 305). "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996); accord State v. Freeland, 451 S.W.3d 791, 815 (Tenn. 2014).

"The due process voluntariness test is distinct from Miranda." State v. Davidson, 509 S.W.3d 156, 189 (Tenn. 2016) (citing Dickerson v. United States, 530 U.S. 428, 434-35 (2000); Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)). "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." Id. (citing Freeland, 451 S.W.3d at 815). The voluntariness test requires this court to assess the psychological impact on the accused and

- 47 -

to evaluate the legal significance of the accused's reaction. Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). When determining whether a confession was made voluntarily, this court must examine the totality of the circumstances, including the "characteristics of the accused and the details of the interrogation." Id. (citing Dickerson, 530 U.S. at 434). These circumstances include:

> "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

Climer, 400 S.W.3d at 568 (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)).

At the suppression hearing, Investigator Roe testified that she told an officer at the Huntsville Hospital to immediately isolate the Defendant and Brandy Eddlemon from each other and from the rest of their family as soon as they arrived. When Investigator Roe arrived at the hospital, the Defendant was alone in an isolated waiting room with an officer present. During the interview process with the Defendant, Investigator Roe talked to Dr. Pickett, who stated he believed this was a homicide case. She acknowledged that the Defendant was detained and not free to leave. Investigator Roe asserted that she read the Defendant his Miranda rights before questioning him. While acknowledging that she did not have the Defendant sign a waiver form, she repeatedly insisted that she provided the Defendant with his Miranda warnings before questioning him and that she provided these warnings both at the hospital and the police station. Investigator Roe clarified that she provided the Defendant with his Miranda warnings before the Defendant decided to speak with her. Investigator Roe admitted that although she kept notes during her questioning of the Defendant at the hospital, she did not make a notation about reading the Defendant his Miranda warnings. She acknowledged that the Defendant appeared to be visibly upset and that the Defendant was "shaky" and "started to cry at different times." She also acknowledged that she wore a gun on her person during the interview with the Defendant. The trial court specifically accredited Investigator Roe's testimony, stating, "We had Miranda with that detention."

The Defendant contends that Investigator Roe never read him his Miranda rights, but that even if this court accredits Investigator Roe's testimony on this point, the evidence showed that Investigator Roe coerced his statement because the Defendant's interrogation took place late at night after a traumatic event; the investigator placed him into custody as soon as he entered the hospital, before Investigator Roe even arrived on the scene or learned any significant facts about the case; he was isolated from his family during the interrogation; and Investigator Roe noted that the Defendant was upset, "shaky," and crying.

Although the Defendant claims that Investigator Roe never provided him with Miranda warnings, he fails to identify any proof that would preponderate against the trial court's decision to accredit Investigator Roe's testimony that she verbally provided the Miranda warnings to the Defendant before questioning him. In addition, there is nothing in this record to suggest that the Defendant did not understand his Miranda rights or that Investigator Roe coerced his statement, rendering his confession involuntary.

In applying the Climer factors, we note that at the time of Investigator Roe's interview, the Defendant was twenty-nine years old. Almost immediately after receiving his Miranda warnings, the Defendant provided his statement. Investigator Roe stated that she only questioned the Defendant for approximately fifteen minutes at the hospital. While the record shows the Defendant was detained prior to his interview with Investigator Roe, there is no proof regarding the length of time the Defendant was detained. In addition, although the evidence shows that the Defendant was shaky and cried during the interview, there is nothing in the record indicating that the Defendant did not want to speak with Investigator Roe at the time he provided his statement. Furthermore, there is no proof that the Defendant was injured, intoxicated, under the influence of drugs, deprived of food, physically abused, or threatened with abuse at the time he provided his statements. Finally, there is no evidence that Investigator Roe extracted the Defendant's statement by any sort of threats or violence, by any direct or implied promises, or through any improper influence. Because the evidence demonstrates that the Defendant provided a voluntary statement to Investigator Roe that was not coerced, the trial court properly denied the motion to suppress as to this statement.

The Defendant, following his interview with Investigator Roe at the hospital, was handcuffed and transferred to the police station. Investigator Roe said she could not recall how long the Defendant was in handcuffs. She admitted that she never believed that Brandy Eddlemon was a suspect and focused only on the Defendant as the perpetrator. Later, at the police department, Lieutenant Brady and Detective Fogle provided the Defendant with his Miranda rights before interviewing him because the Defendant was already in custody. Before interviewing the Defendant, they spoke to Investigator Roe, who gave them the information she obtained during her interview with the Defendant.

In February 2015, Investigator Goetz interviewed the Defendant. This interview occurred at the Defendant's parents' home, and Investigator Goetz did not read the Defendant his Miranda warnings. On March 12, 2015, Investigator Goetz again interviewed the Defendant at his parent's home and again did not provide the Defendant with his Miranda warnings prior to conducting the interview. Years later, on June 18, 2019, he interviewed the Defendant at the district attorney's office, and because Investigator Goetz treated the Defendant as a suspect during this last interview, he provided the Defendant with his Miranda rights prior to questioning him.

The Defendant asserts that any statements he made during subsequent interviews with Lieutenant Brady and Detective Fogle, and later Investigator Goetz, should be suppressed as "fruit of the poisonous tree" because the officers in the later interviews relied on information improperly obtained by Investigator Roe. Pursuant to the "fruit of the poisonous tree" doctrine, evidence obtained through an unlawful search or seizure is excluded from use by the State. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); Huddleston, 924 S.W.2d at 674. This exclusionary rule "was designed to protect Fourth Amendment guarantees by deterring lawless searches, seizures, and arrests." Huddleston, 924 S.W.2d at 674.

Specifically, the Defendant argues that Lieutenant Brady, Detective Fogle, and Investigator Goetz used information and statements illegally obtained by Investigator Roe in her initial interview with the Defendant. He asserts that although his later statements were not confessions, they were "elicited using the information obtained by Investigator Roe in contravention of the Defendant's constitutional protections." He also claims the State used his later statements against him at trial "by trying to demonstrate through State experts that [the Defendant]'s timeline of events was impossible, and to attack [the Defendant]'s credibility." Consequently, he asserts that his later statements should be suppressed as "fruit of the poisonous tree." We have already determined that the Defendant's statement to Investigator Roe was voluntary and not coerced. Accordingly, we conclude that the Defendant's later statements to the other officers should not be suppressed as "fruit of the poisonous tree." Because the record fully supports the trial court's denial of the suppression motion, the Defendant is not entitled to relief on this issue.

**III. Aggravated Child Neglect Statute.** The Defendant also argues that the aggravated child neglect statute violates due process because it is vague and fails to give proper notice of prohibited conduct. Specifically, he claims that Code section 39-15-402(a), the aggravated child neglect and abuse statute, fails to adequately define "neglect," which precludes an individual from determining what proof is required to sustain a conviction. He also claims Code section 39-15-402(a) fails to define the phrase "so as to adversely affect the child's health and welfare" and fails to explain whether this phrase

requires proof of some actual detriment or harm before criminal liability may be imposed. In response, the State asserts that this court has repeatedly held that the statute is constitutional. We conclude that because this statute is not unconstitutionally vague, the Defendant is not entitled to relief.

This court reviews issues of constitutional interpretation de novo with no presumption of correctness. State v. Merriman, 410 S.W.3d 779, 791 (Tenn. 2013); State v. White, 362 S.W.3d 559, 565 (Tenn. 2012) (citing Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008)). "In construing legislative enactments, we presume that every word in a statute has meaning and purpose; each word should be given full effect if the obvious intention of the General Assembly is not violated by so doing." Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ., 244 S.W.3d 302, 309 (Tenn. 2007) (citing In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005)). "When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). On the other hand, if the statute is ambiguous, we must look to the "broader statutory scheme, the history of the legislation, or other sources to discern its meaning." State v. Casper, 297 S.W.3d 676, 683 (Tenn. 2009). When interpreting statutes, this court must begin with the presumption that legislative acts are constitutional. State v. Pickett, 211 S.W.3d 696, 700 (Tenn. 2007). "'[W]e must indulge every presumption and resolve every doubt in favor of constitutionality.'" Lynch v. City of Jellico, 205 S.W.3d 384, 390 (Tenn. 2006) (quoting Vogel v. Wells Fargo Guard Servs., 937 S.W.2d 856, 858 (Tenn. 1996)).

"'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'" Pickett, 211 S.W.3d at 704 (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). Pursuant to the Due Process Clause of the Fourteenth Amendment to the Federal Constitution and article I, section 8 of the Tennessee Constitution, a criminal statute cannot be enforced when it prohibits conduct "'in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application[.]'" Id. (quoting Leech v. Am. Booksellers Ass'n, 582 S.W.2d 738, 746 (Tenn. 1979)). The fair warning requirement in the due process clause prohibits the states from holding individuals criminally responsible for conduct which they could not reasonably understand to be proscribed. Id. "If a statute is to avoid unconstitutional vagueness, it must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 532 (Tenn. 1993) (quoting Kolender v. Lawson, 461 U.S. 352, 358 (1983)).

However, the Tennessee Supreme Court has held that the fair warning requirement "does not demand absolute precision in the drafting of criminal statutes." State v. Burkhart, 58 S.W.3d 694, 697 (Tenn. 2001). "The constitutional test for vagueness is whether a statute's 'prohibitions are not clearly defined and are susceptible to different interpretations as to what conduct is actually proscribed.'" Pickett, 211 S.W.3d at 704 (quoting State v. Forbes, 918 S.W.2d 431, 447-48 (Tenn. Crim. App. 1995)). Accordingly, a statute is not unconstitutionally vague if "by orderly process of litigation [it] can be rendered sufficiently definite and certain for purposes of judicial decision." Burkhart, 58 S.W.3d at 697.

The aggravated child neglect statute states that "[a] person commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in § 39-15-401(b) . . . and . . . [t]he act of . . . neglect . . . results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a). A person commits child neglect who "knowingly . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Id. § 39-15-401(b).

This court has repeatedly held that "[t]he 'common understanding' of 'neglect' is 'to ignore or disregard' or 'to fail to care for or attend to sufficiently or properly.'" State v. Smith, No. 1153, 1990 WL 134934, at *3 (Tenn. Crim. App., at Knoxville, Sept. 20, 1990) (quoting Webster's New World Dictionary 907 (3d coll. ed. 1988)); see State v. Burton, No. E2015-00879-CCA-R3-CD, 2016 WL 3351316, at *4 (Tenn. Crim. App. June 9, 2016). Moreover, this court has concluded "[t]he neglect of 'a child so as to adversely affect its health and welfare' presents a plain and certain meaning" and "[t]he warning of the prohibited conduct is . . . sufficiently clear." Smith, 1990 WL 134934, at *3; see Burton, 2016 WL 3351316, at *4.

In Mateyko, 53 S.W.3d at 669, the Tennessee Supreme Court granted the State's appeal on the issue of whether the pre-2005 version of Tennessee Code Annotated section 39-15-401(a) required proof of an actual, deleterious effect upon the child's health and welfare. While the State argued that the phrase "adversely affect" did not require a harm to actually occur and only required that a defendant put the child's health and welfare at risk of suffering some harm, the defendant countered that the child neglect statute required proof of some actual harm and that a mere risk of harm to the child was insufficient. Id. at 670. The court held that because the parties legitimately disputed the ordinary meaning of the language in the statute, the court needed to look beyond the language and examine the entire statutory scheme for guidance. Id. Ultimately, the Mateyko court held that "a mere risk of harm in the neglect context is . . . insufficient" and that "before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." Id. at 671-72.

In light of the plain meaning of the term "neglect" used in the statute and this court's guidance in <u>Mateyko</u> regarding the interpretation of the phrase "so as to adversely affect the child's health and welfare," we conclude that the aggravated child neglect statute is sufficiently clear to put an ordinary person of common intelligence on notice that it is a crime to knowingly fail to care for a child where such an omission results in an adverse effect the child's health and welfare and where the act of neglect results in serious bodily injury to the child. <u>See</u> Tenn. Code Ann. § 39-15-402(a); <u>Burton</u>, 2016 WL 3351316, at *4; <u>Smith</u>, 1990 WL 134934, at *3. Because the aggravated child neglect statute is not unconstitutionally vague, the Defendant is not entitled to relief on this issue.

**IV. <u>Proof that Medical Examiner Lost Medical License.</u>** The Defendant additionally argues that the trial court violated his right to a fair trial when it overruled the defense's objection and allowed the State to present evidence that Charles Harlan, the medical examiner who performed the victim's first autopsy, lost his medical license. The Defendant asserts that Dr. Harlan's license was revoked in 2005, which was well after he conducted the victim's autopsy where he opined the victim's death was accidental. The Defendant claims the fact that Dr. Harlan's medical license was revoked years after he performed the victim's autopsy "does not make it more probable or less probable that [the Defendant] engaged in aggravated child abuse or aggravated child neglect." Instead, he claims this evidence "served only to confuse the jury and discount the defense theory that [the victim]'s death was an accident." He also argues that even if this evidence was relevant, the limited probative value of this proof was substantially outweighed by the danger of unfair prejudice because it "risked introducing extraneous issues and causing the jury to decide the case on an improper basis." In response, the State contends that the Defendant is not entitled to relief because the trial court properly admitted this evidence. We agree with the State.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." <u>State v. Franklin</u>, 308 S.W.3d 799, 809 (Tenn. 2010) (citing <u>State v. Lewis</u>, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court "'abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.'" <u>State v. Reynolds</u>, 635 S.W.3d 893, 921 (Tenn. 2021) (quoting <u>Lee Med., Inc. v. Beecher</u>, 312 S.W.3d 515, 524 (Tenn. 2010)).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough

relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not overturn a trial court's determination regarding relevancy absent an abuse of discretion. State v. Brown, 373 S.W.3d 565, 573 (Tenn. Crim. App. 2011) (citing Forbes, 918 S.W.2d at 449).

Prior to trial, the Defendant filed a motion in limine, objecting to the introduction of evidence that Dr. Harlan lost his medical license in 2005 while simultaneously seeking to admit Dr. Harlan's 2001 autopsy report opining that the victim's death was an accident. In this motion, the Defendant asserted that evidence of the loss of Dr. Harlan's medical license was irrelevant and that admission of such evidence would have "a prejudicial effect on the [D]efendant" and would seriously damage the Defendant's "right to a fair trial and due process of law."

At the motion hearing, defense counsel argued that he anticipated that the State would show at trial that Dr. Harlan, who conducted the first autopsy on the victim and determined the victim's death to be accidental, later lost his medical license because he was incompetent. Defense counsel argued that, in his opinion, Dr. Harlan's medical license was actually taken because "he was a very quirky man who said a lot of things he shouldn't have said" and some of these things "were offensive." He also acknowledged that for some reason he could not explain, Dr. Harlan "tried to get the death certificate [for the victim in this case] changed from the [victim] dying in Huntsville to him dying in Maury County[,]" even though the victim clearly died in Huntsville. Defense counsel said that while the board found that Dr. Harlan should not have done a lot of what he did in this case, the board did not disagree with Dr. Harlan's analysis of the victim's injury. He also asserted that Dr. Harlan's findings were not that different from those of Dr. Li, who conducted the victim's second autopsy, because both doctors opined that the victim died as a result of a "very severe blow to the back of the head." Defense counsel said the State was going to argue that the second autopsy showed a homicide, which the defense challenged on the basis that Dr. Li did not have the evidence to show this was a homicide. Defense counsel added that the way the State got "off track" in this case was because Investigator Roe claimed the Defendant told her that the victim's injury was caused by a fall off the bed when in reality, the Defendant "never said that" and actually told her "he didn't know how [the victim's injury] was caused." He noted no one seemed to think that the victim's death was anything

but accidental in 2001 and that Lieutenant Brady and Detective Fogle conducted their investigation and closed the case without filing any charges two days later.

Defense counsel also asserted that Dr. Li worked with Dr. Levy, who did not get along with Dr. Harlan, and that it was "almost inevitable" that Dr. Li would find the victim's death was a homicide because one of Dr. Li's assistants had been in "constant communication" with Investigator Goetz for the past three or four years telling him the victim's death was a homicide. In addition, he noted that Brandy Eddlemon, the victim's mother, was able to hire her own pathologist to participate in the victim's autopsy. He asserted that it seemed "awfully strange . . . that a person of interest back then could hire a pathologist to sit in on the [victim's second] autopsy and give his opinion about whether he thought it was a homicide or not when his own client might have been charged with [the victim's] murder." Defense counsel maintained that if the trial court allowed evidence of the loss of Dr. Harlan's medical license, it would taint the jury because the prejudicial effect would outweigh whatever benefit there was in allowing the evidence. He also asserted that it was "very ironic" that the district attorney's office who hired Dr. Harlan was now saying Dr. Harlan was "incompetent" and should never had done the victim's autopsy.

In response, the State asserted during the hearing that it would have no less than four and no more than six medical experts, none of whom had lost their medical licenses, who would all disagree with Dr. Harlan's opinion that the manner of the victim's death was accidental. Citing State v. Crump, No. 2006-02244-CCA-R3-CD, 2009 WL 723524, at *41 (Tenn. Crim. App. Mar. 18, 2009), which also involved Dr. Harlan, the State asserted that the fact that its medical experts still had their medical licenses and Dr. Harlan did not was "relevant" and that to keep that evidence from the jury would be "distorting the facts." Referencing State v. Zeigler, No. M2017-01091-CCA-R3-CD, 2019 WL 484647, at *19 (Tenn. Crim. App. Feb. 7, 2019), the State argued that it did not matter if it was the State asking to limit a defense witness or the defense asking to limit a State's witness, "[w]hen it comes to questions of competence and credibility for an expert witness, those facts [regarding medical licenses] are always going to be relevant." The State acknowledged that it would be introducing Dr. Harlan's 2001 autopsy of the victim, but it would also "make sure that the jury kn[ew] about the context with which they should view Dr. Harlan's testimony and the weight that they should give to it." At the conclusion of argument, the trial court denied the motion in limine, stating that "[t]he status of [Dr. Harlan's] medical license is relevant in this trial[,]" and it "goes to weight for the trier of fact[.]"

We note that this court has previously concluded that the trial court did not err in allowing the State to cross-examine Dr. Harlan about the status of his medical license. Crump, 2009 WL 723524, at *41. Specifically, this court held that this proof was relevant:

The court limited the extent to which the State was allowed to inquire about medical board proceedings relative to Dr. Harlan's license. The fact that Dr. Harlan's performance of his duties as a medical doctor had been the subject of disciplinary proceedings which had resulted in adverse findings was relevant to his qualifications and credibility as an expert witness. This was relevant evidence for the jury to evaluate in weighing Dr. Harlan's testimony.

Id.

The order permanently revoking Dr. Harlan's medical license, which was admitted at trial, shows that Dr. Harlan lost his medical license, in part, based on acts he committed relating to the victim's autopsy in this case, including that: (1) Dr. Harlan attempted to have the pediatric neurosurgeon in Huntsville change the Alabama death certificate to reflect Dr. Harlan's opinion that the victim's death was accidental; (2) Dr. Harlan caused a Tennessee death certificate to be issued stating that the victim died in Maury County, Tennessee, and listing the victim's cause of death to be accidental, even though he knew the victim did not die in Tennessee; and (3) Dr. Harlan's cause and manner of death of the victim in this case was inconsistent with the medical proof, available to him at the time of his autopsy of the victim, which showed the victim's actual manner of death was the result of "non-accidental trauma." We conclude the loss of Dr. Harlan's medical license was relevant evidence for the jury to consider when evaluating the credibility of Dr. Harlan's opinion that the victim's manner of death was accidental against the testimony of five other physicians, who all disagreed with Dr. Harlan and concluded that the victim's manner of death was homicide. Therefore, we conclude that the trial court did not abuse its discretion in admitting this evidence.

**V.  Exclusion of Hearsay Evidence.**  The Defendant asserts that the trial court erred in sustaining the State's hearsay objection to his cross-examination of Investigator Goetz concerning a statement that Amy Harless allegedly made to him. He claims this line of questioning would have shown that Investigator Goetz was biased against him and that the victim's mother actually committed this crime. The Defendant argues that the trial court, by sustaining this objection, denied him the right to present a defense. In response, the State contends that the trial court properly excluded this hearsay evidence and that the Defendant was able to introduce this proof later through Harless's testimony. We agree with the State.

The Confrontation Clause of the Sixth Amendment and article I, section 9 of the Tennessee Constitution provide criminal defendants with the right to physically face witnesses and the right to cross-examine witnesses. See State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000) (first citing Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); and then citing State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992)). In addition, the Sixth

Amendment and the Due Process Clause of the Fourteenth Amendment guarantee a criminal defendant the right to present a defense. See id. at 432 (first citing Taylor v. Illinois, 484 U.S. 400, 408 (1988); then citing Washington v. Texas, 388 U.S. 14, 23 (1976); then citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973); and then citing State v. Sheline, 955 S.W.2d 42, 47 (1997)).

The right of cross-examination includes "the right to establish bias or to otherwise impeach the credibility of a witness." Echols, 382 S.W.3d at 284-85; see Tenn. R. Evid. 616 ("A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."). "The exposure of a witness's motivation in testifying is a proper and important function of cross-examination." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001) (citing Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)). In such cases, the defendant is required to show that a rational jury "might have received a significantly different impression of the witness's credibility had counsel been permitted to pursue his proposed line of cross-examination." State v. Black, 815 S.W.2d 166, 177 (Tenn. 1991) (citing Van Arsdall, 475 U.S. at 680).

Generally, the propriety, scope, manner and control of the cross-examination of witnesses rest within the sound discretion of the trial court. State v. James, 315 S.W.3d 440, 460 (Tenn. 2010) (first citing State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993); and then citing State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995)). "This Court will not disturb the limits placed upon cross-examination by the trial court, unless the trial court has unreasonably restricted the right." State v. Gentry, 538 S.W.3d 413, 429 (Tenn. 2017). The right of cross-examination "is subject to the restrictions created by the applicable statutes, rules of evidence, rules of criminal procedure, and the common law rules created by the appellate courts." State v. Adkisson, 899 S.W.2d 626, 644-45 (Tenn. Crim. App. 1994). "'[A] defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation.'" State v. Wyrick, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001) (quoting State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994)).

The Tennessee Supreme Court has recognized that "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony." State v. Flood, 219 S.W.3d 307, 315-16 (Tenn. 2007) (first citing Chambers, 410 U.S. at 294; and then citing Brown, 29 S.W.3d at 431). In Washington v. Texas, the United States Supreme Court reiterated that the right to present a defense is a fundamental element of due process:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19.

Nevertheless, the right to present evidence and witnesses is not absolute. Brown, 29 S.W.3d at 432. An accused, in exercising this right, must comply with the established rules of procedure and evidence, which are "designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." Flood, 219 S.W.3d at 316.

Typically, an evidentiary ruling does not rise to the level of a constitutional violation. State v. Rimmer, 623 S.W.3d 235, 279 (Tenn. 2021). However, "the erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." State v. Bell, 512 S.W.3d 167, 190-91 (Tenn. 2015). In determining whether the exclusion of evidence violates a defendant's constitutional right to present a defense, this court must consider:

(1) Whether the excluded evidence is critical to the defense;
(2) Whether the evidence bears sufficient indicia of reliability; and
(3) Whether the interest supporting exclusion of the evidence is substantially important.

Flood, 219 S.W.3d at 316 (first citing Brown, 29 S.W.3d at 434-35; then citing Rice, 184 S.W.3d at 673; and then citing State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

At trial, defense counsel asked Investigator Goetz on recross if he interviewed Amy Harless, and Investigator Goetz replied affirmatively. He then asked if Harless had told him that "[Eddlemon] was a friend," and the State objected on the ground of hearsay. During the bench conference, defense counsel argued that he wanted to ask Investigator Goetz about Harless's statements, not "for the truth" of the matter asserted, but to show Investigator Goetz's "bias" under Tennessee Rule of Evidence 616. The State asserted that Investigator Goetz cannot be asked "to speak for Amy Harless" and the defense had the "opportunity to call witnesses." When the trial court asked what was defense counsel's

question, he replied that he really wanted to ask Investigator Goetz, "Did Amy Harless tell you that Brandy [Eddlemon] told her that the child was injured before [Brandy] left for work?" The State countered that that particular question was "double hearsay" and therefore "inadmissible." The trial court ultimately sustained the State's objection.

During the defense's case-in-chief, Amy Harless testified that Brandy Eddlemon called her from the hospital in Alabama in the early hours of January 21, 2001, and told her that the victim fell before Brandy went to work, "but he seemed fine." She later informed Agent Tenry about Brandy's statement. Harless said that in 2015 she told Investigator Goetz about her 2001 statement to Agent Tenry regarding Brandy's admission that the victim fell before Brandy left for work. On cross-examination, Harless did not recall telling Investigator Goetz that she did not remember giving the 2001 statement to Agent Tenry. She said that at the time, she did not know that Agent Tenry worked for the TBI and that when she called the district attorney's office, that office put Agent Tenry in touch with her, and she and Agent Tenry later spoke over the phone.

Harless stated that when she gave her August 2001 statement to Agent Tenry, approximately seven months had passed since the victim died. When asked if there was a reason she waited seven months, Harless said that Brandy's story about the victim falling before she went to work "changed several times" and she was "conflicted about it." She confirmed that she and Brandy never had a disagreement or argument between the time when Brandy made this statement to her about the victim and when Harless reported it to law enforcement.

During the State's rebuttal proof, Eddlemon was asked if she talked to Harless the day of or the day after the victim passed away, and Eddlemon replied, "Not to my recollection, no." Eddlemon specifically denied telling Harless that anything happened with the victim that morning that would have caused the victim's injuries. When she was asked if she told Harless that the victim was already injured when Eddlemon left for work, Eddlemon replied, "Absolutely not." Eddlemon confirmed that nothing happened by her or in her presence that could have caused the injury to the victim's head.

Also during the State's rebuttal proof, Investigator Goetz testified that Amy Harness originally provided her statement to Agent Tenry on August 1, 2001, which was conspicuously five days after the second hearing on exhuming the victim's body but before the final order was issued approving the victim's exhumation. Investigator Goetz stated that during his meeting with Harless on February 27, 2015, he asked Harless about "the written statement concerning what Brandy had told her," and Harless said she "did not recall" making that statement." Upon providing the written statement for her to read, Harless ultimately acknowledged that she had made the written statement. Investigator Goetz asserted that after the medical experts opined that the victim's injury could not have

occurred before he ate, he began to question the veracity of Harless's statement. He confirmed that when he spoke to Harless on February 27, 2015, which was fairly early in his investigation, he still considered Brandy Eddlemon a suspect in this case.

The Defendant asserts that Investigator Goetz received information from Amy Harless that Brandy had called Harless while still at the hospital on January 20, 2001, and told her that the victim had fallen before she left for work but that he seemed fine. The Defendant asserts that this evidence "was crucial" to his case because it corroborated his statement and the defense theory that the victim was injured while in Eddlemon's care. He also asserts that this evidence bore sufficient indicia of reliability because Harless was close friends with Brandy Eddlemon and that Harless contacted the police about Brandy's statements in 2001 after the investigation had been closed. Finally, he argues that there was no interest in excluding the evidence that Investigator Goetz spoke with Harless, who confirmed the statement she made to police in 2001, because this is "critical, reliable hearsay evidence of an alternative explanation for the injury" to the victim and is "dispositive of whether Brandy was a reliable witness." He claims this evidence is important in "determining who injured [the victim]" and whether the Defendant "knew [the victim] was injured." He also claims this line of questioning would have shown that Investigator Goetz was biased and that another individual actually committed the crime.

The Defendant has failed to show that the trial court's exclusion of this hearsay evidence for which there was no exception denied him the right to present a defense. At trial, the Defendant presented the theory that the victim was injured before he arrived home, and the Defendant was allowed to present evidence, through Harless's testimony, that Eddlemon told her that the victim was injured before Eddlemon left for work that day. We conclude that the trial court properly excluded the evidence as hearsay. In any event, the trial court later allowed the Defendant to introduce this proof through Harless's testimony during the defense's case-in-chief. We also conclude that the Defendant's claims regarding Investigator Goetz's bias are unpersuasive and would not have changed the jury's impression of Investigator Goetz's credibility had the defense been allowed to pursue the proposed line of recross-examination. Accordingly, we conclude that the Defendant was not denied the right to present a defense.

**VI. <u>Declining to Declare a Mistrial.</u>** The Defendant asserts that the trial court should have declared a mistrial when Investigator Tommy Goetz testified at trial about a domestic violence incident between the Defendant and Brandy Eddlemon. He claims that the proof against him was weak and that Investigator Goetz's reference to the domestic violence incident was extremely prejudicial because it undermined the Defendant's credibility in a close case. See State v. Clark, 452 S.W.3d at 290 (Tenn. 2014). The State counters that the trial court did not abuse its discretion in declining to grant a mistrial. We agree with the State.

"'The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.'" State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The decision to grant or deny a mistrial rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Robinson, 146 S.W.3d at 494 (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). The party seeking a mistrial has the burden of establishing the necessity for a mistrial. Reid, 164 S.W.3d at 342 (citing Williams, 929 S.W.2d at 388). In determining whether a trial court abused its discretion in granting or denying a mistrial, this court should consider the following factors: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing State v. Taylor, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *10 (Tenn. Crim. App. Feb. 14, 2003)).

Prior to trial, the trial court determined that the State would "not refer to Defendant's 2006 conviction" for domestic violence. At trial, the State asked Investigator Goetz why he began his investigation in this case by interviewing Brandy Eddlemon, the victim's mother. Investigator Goetz replied that in gathering the pertinent records, he saw that Eddlemon and the Defendant "had gotten married" but later divorced and that "there was a domestic violence involved." Defense counsel immediately objected, and the prosecutor asserted that he was "not going to dwell on that at all" and "was moving straight on." The trial court instructed the jury "not to consider those two words," referring to the words "domestic violence."

During the ensuing jury-out hearing, defense counsel moved for a mistrial on the basis that Investigator Goetz's reference to the Defendant's domestic violence was "so prejudicial, especially in a case like this where the question is child abuse" that the Defendant could not receive a fair trial. The prosecutor replied he wished that it had not been mentioned but asserted that Investigator Goetz did not identify the alleged perpetrator in the domestic violence and that the trial court's limiting instruction was sufficient. When the trial court suggested the possibility of a second limiting instruction, defense counsel replied that an additional instruction would just call more attention to the error, and the trial court agreed that it had not wanted to repeat the two words "domestic violence" in its initial curative instruction. However, the court overruled the defense's motion for a mistrial because it did not feel that Investigator Goetz's comment about the domestic

violence rose to "manifest injustice." The court expressed its hope that Investigator Goetz would not mention the domestic violence again, and the prosecutor, who agreed this evidence was inadmissible, said he was not looking to elicit that information at all and that he had "gone to great pains to make sure that this jury [would not] hear that[.]" The prosecutor then said he was going to move on in his questioning.

The Defendant argues that Investigator Goetz's mention of his domestic violence incident was highly prejudicial in light of his charges for violent crimes in this case. He asserts that despite the trial court's ruling that the State would not reference his 2006 conviction for domestic violence, the State elicited testimony concerning this domestic violence from Investigator Goetz on direct examination. He also asserts that although Investigator Goetz may not have testified that the Defendant was the party charged and convicted, most jurors would assume that Brandy Eddlemon was the victim. The Defendant claims this evidence was even more prejudicial because the State's proof against him was weak, given that there were no eyewitnesses to the crimes charged in this case and that none of the medical experts were able to determine when the victim was injured, how the victim was injured, or who injured the victim. He also insists that by the time the trial court provided the curative instruction "the damage had already been done." For all these reasons, the Defendant contends that Investigator Goetz's reference to the domestic violence incident prevented him from receiving a fair and impartial trial.

First, the record shows that the prosecutor did not deliberately elicit this information. Looking at the context in which the State asked this question, it appears that the State was merely trying to elicit why Investigator Goetz began his investigation with Brandy Eddlemon.

Second, the trial court immediately issued a curative instruction in response to Investigator Goetz's comment, specifically instructing the jury to disregard "those two words," referring to the words "domestic violence." The court later explained that it did not want to repeat "domestic violence" because it did not want to emphasize those words for the jury. The jury is presumed to follow the instructions of the trial court. State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008); Reid, 164 S.W.3d at 346; Robinson, 146 S.W.3d at 494.

Third, we have already concluded that the State presented sufficient evidence to sustain the Defendant's conviction. Although the Defendant suggested to officers that the victim injured himself falling from a bed, several medical experts testified that falling from a bed would never cause the type of severe head injury sustained by the victim. The proof also established that the Defendant was the only person with the victim at the time that he could have been injured, and the medical experts consistently testified that the victim's severe injuries would have been immediately apparent to anyone around the victim.

Although the Defendant would have had to have been aware of the victim's horrific head injury, the Defendant waited several hours before seeking medical treatment for the victim. This delay in seeking treatment had an actual and deleterious effect on the victim's health because it caused the victim to suffer extensive brain damage, a completely separate injury aside from the initial head injury. In light of this evidence, the trial court held that Investigator Goetz's comment did not rise to the level of manifest injustice, and we agree with the conclusion of the trial court. Given the substantial proof of the Defendant's guilt, we conclude that the trial court did not abuse its discretion in refusing to grant a mistrial.

**VII. <u>Double Jeopardy.</u>** Lastly, the Defendant contends that his single prosecution for felony murder committed in the perpetration of both aggravated child abuse and aggravated child neglect violates double jeopardy because these charges were for the same offense and arose from the same conduct. The State responds that there is no double jeopardy violation because felony murder in the perpetration of child abuse and felony murder in the perpetration of child neglect are "separate and distinct offenses" and because "the defendant stands convicted of one criminal offense." We conclude that the Defendant is not entitled to relief.

Both the United States and Tennessee Constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offense." U.S. Const. amend. V; Tenn. Const. art. I, § 10. The double jeopardy clause protects against a second prosecution for the same offense after an acquittal, protects against a second prosecution for the same offense after conviction, and protects against multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The Defendant claims his issue relates to the third category, protection against multiple punishments for the same criminal offense. In single prosecution cases, such as this case, "the double jeopardy prohibition against multiple punishments functions to prevent prosecutors and courts from exceeding the punishment legislatively authorized." Id. (first citing Albernaz v. United States, 450 U.S. 333, 344 (Tenn. 1981); and then citing Brown v. Ohio, 432 U.S. 161, 165 (1977)). "[A] single wrongful act may not furnish the basis for more than one criminal prosecution[,]" but "[i]f each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous" and "[w]here time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act." State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). Whether multiple convictions violate double jeopardy principles is a mixed question of law and fact that this court reviews de novo with no presumption of correctness. State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing State v. Thompson, 285 S.W.3d 840, 846 (Tenn. 2009)).

"In single prosecutions, multiple-punishment claims fall into one of two categories: (1) 'unit-of-prosecution' claims or (2) 'multiple description' claims. Id. (citing Watkins,

362 S.W.3d at 543). "Unit-of-prosecution claims result when a defendant who has been convicted of multiple violations of the <u>same</u> statute asserts that the multiple convictions are for the same offense." <u>Id.</u> (citing <u>Watkins</u>, 362 S.W.3d at 543). However, "multiple description claims arise when a defendant who has been convicted of multiple criminal offenses under <u>different</u> statutes alleges that the statutes punish the same offense." <u>Id.</u> (citing <u>Watkins</u>, 362 S.W.3d at 544).

Here, the Defendant argues that he has received multiple punishments for the same offense, which is analyzed as a unit-of-prosecution claim. He asserts that "the true issue is whether double jeopardy rights are violated when a defendant is tried for one offense, consisting of a series of acts, and a second offense, based upon a single act, which is one of the series of acts in the first count." He also claims that under the State's theory, he would have had to cause the victim's injury and then knowingly decided not to seek medical treatment for the victim, which caused further injury and led to the victim's death. Accordingly, the Defendant asserts that prosecuting the Defendant for both felony murder predicated on aggravated child neglect and felony murder predicated on aggravated child abuse violates double jeopardy principles.

We note that the Defendant was convicted of only one offense, felony murder committed in the perpetration of aggravated child neglect, because the jury acquitted him of felony murder committed in the perpetration of aggravated child abuse in Count 1. Consequently, there is no double jeopardy violation because the Defendant is not being punished for multiple offenses. Moreover, the Defendant is protected from a second prosecution on the acquitted charge in Count 1 because jeopardy attached at the first trial. <u>See</u> <u>Watkins</u>, 362 S.W.3d at 541. For these reasons, the Defendant is not entitled to relief.

## <u>CONCLUSION</u>

Based on the foregoing, the judgment of the trial court is affirmed.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE